## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| RACHAEL C. MOONEY and MATTHEW B. MOONEY, | ) ) ) | CIVIL ACTION NO: |
| Plaintiff, | ) ) ) | 1:22-cv-00083 |
| v. | ) ) ) | |
| THE BOEING COMPANY, | ) ) ) | JURY TRIAL REQUESTED |
| Defendant. | ) ) ) | |

## COMPLAINT

Rachael C. Mooney and Matthew B. Mooney (collectively, the "Plaintiffs"), joined pursuant to Federal Rule of Civil Procedure ("FRCP") 20, bring this action against the Boeing Company ("Boeing") to recover their losses suffered due to Boeing's violations of Section 10(b) of the Securities Exchange Act, 15 U.S.C.S. §78j(b), §240.10b-5 of Article 17 of the Code of Federal Regulations ("SEC Rule 10b-5") promulgated thereunder, and fraudulent omissions made when filing its quarterly and annual reports.

## PRELIMINARY STATEMENT

Plaintiffs' complaint is exclusively predicated upon Boeing's January 6, 2021, admission that from November 2016 through December 2018, it knowingly, and with the intent to defraud, conspired to criminally defraud the United States government in order to obtain an improper Federal Aviation Administration ("FAA") certification for its 737 MAX airplane.

Boeing admits that one of its "stated objectives in designing [its] 737 MAX included securing… 'Level B' differences-training in the [FAA's] 737 MAX FSB Report."[1] 'Level B' differences-training was a lesser training standard that was faster and cheaper to implement for Boeing's customers.

Thus, Boeing's most important product was the 737 MAX _with_ 'Level B' differences-training. Without 'Level B' differences-training, the 737 MAX was not as competitive in the marketplace and, therefore, not as valuable to Boeing or its investors.

In order to achieve its stated goal, Boeing admits to criminally deceiving the FAA to obtain 'Level B' differences-training. Boeing admits that the, "purpose of [Boeing's] conspiracy was to defraud the FAA AEG by impairing, obstructing, defeating and interfering with the lawful function of the FAA AEG by dishonest means in connection with its publication of the 737 MAX FSB Report and its differences-training determination for the Boeing 737 MAX in order to bring about financial gain to Boeing and to benefit Boeing Employee-1 and Boeing Employee-2 in connection with the Boeing 737 MAX."[2] Boeing's most important airplane was the product of a criminal, fraudulent conspiracy designed by Boeing to fulfill its desire to bring about financial gain to itself.

Boeing's criminal admission renders its Securities and Exchange Commission ("SEC") filings made from November 2016 thorough December 2020 fraudulent. By choosing to speak about its 737 MAX and its business risks, Boeing had a duty to

---

[1] Boeing's Deferred Prosecution Agreement at A-6, Paragraph 19. (Ex.1, attached hereto)
[2] Boeing's Deferred Prosecution Agreement at A-5, Paragraph 17.

disclose its criminal conspiracy in order to make its financial and risk statements complete and not misleading.

Boeing's generic risk warnings were insufficient given how its undisclosed, existing, criminal conspiracy substantially affected reasonable calculations of the probability of risk related to an investment in Boeing's securities. Boeing's undisclosed risk cannot be overstated. Its most important product was a fraud. Its admitted motivation was to benefit itself by deceiving its customers, regulators and investors.

Boeing's criminal fraud set in motion a series of events that resulted in two catastrophic, fatal crashes, the grounding of the 737 MAX and billions of dollars in losses. The materialization of Boeing's concealed risk led to a significant decline in Boeing's share price and, therefore, Plaintiffs' financial loss, which was a foreseeable result of its criminal conspiracy.

Prior to its admission, Boeing vigorously denied any wrongdoing related to its subsequently admitted criminal fraud. Plaintiffs' claims were discoverable and actionable only after Boeing's admission became public. Before that, it was reasonable for investors, including Plaintiffs, to believe that Boeing had not willfully and intentionally perpetrated a criminal conspiracy against the U.S. government.

Separate and apart from any other conduct, Plaintiffs have a unique cause of action and right to recover their losses that were proximately caused by Boeing's admitted criminal conspiracy to defraud the U.S. government.

Had Boeing properly disclosed its scheme, Plaintiffs would not have invested in Boeing's securities. Both Plaintiff Rachael Mooney's and Plaintiff Matthew Mooney's damages stem from their investments in Boeing securities made in reliance upon the

integrity of Boeing's share price and the truthfulness of its SEC filings. Both plaintiff's losses spring from damage suffered as a result of the materialization of the risk concealed via Boeing's fraudulent omissions related to its subsequently admitted criminal conspiracy to defraud the United States government.

## BACKGROUND

Plaintiffs began investing in Boeing's securities on May 17, 2018, in Plaintiff Rachael Mooney's investment account. Plaintiff Rachael Mooney purchased sixty-nine shares of Boeing at $342.1668 per share. That day, Defendant's share price closed at $342.12 per share.

Plaintiff Matthew Mooney read and reviewed Boeing's SEC filings prior to recommending to Plaintiff Rachael Mooney that she purchase Boeing shares. Plaintiff Rachael Mooney's purchase was informed by Boeing's current share price and Plaintiff Matthew Mooney's communication to her of the risks associated with investing in Boeing based on his review of Boeing's statements and SEC filings.

Boeing's statements contained in its SEC filings were a material factor influencing Plaintiffs' decision to invest. By omitting to disclose is criminal scheme, Boeing deceived Plaintiffs into believing that it was operating lawfully and that its financial reports were based on legal activity. Neither was true.

Boeing's 737 MAX airplane was its most important new product and critical to its financial success. As a precondition to its flying, Boeing needed to obtain FAA certification for its 737 MAX. The FAA is an agency of the United States government. The U.S. government is Boeing's primary regulator and largest customer.

Unbeknownst to investors including Plaintiffs, Boeing willfully and intentionally perpetrated a criminal fraud upon the United States government to obtain improper 737 MAX certification from the FAA.

On March 11, 2019, Plaintiff Matthew Mooney began investing in Boeing in his account. Mooney is a professional investor and experienced derivatives trader. Plaintiff Matthew Mooney effected his investment in Boeing via a complex derivatives structure that allowed him to receive a positive carry rate on his investment. Plaintiff Matthew Mooney's investment in Boeing began on March 11, 2019, with his sale of two Boeing March 15, 2019, 380 strike put options for $400/per contract. Plaintiff Matthew Mooney's long investment in Boeing existed with negligible interruption from March 11, 2019 through March 16, 2020, via a series of interrelated derivative trades. On March 16, 2020, Plaintiff Matthew Mooney finally terminated his Boeing investment via the purchase of seven Boeing January 15, 2021 expiry 305 strike puts for $17,300/per contract. Despite multiple transactions necessitated to account for the temporal nature of derivative securities, Plaintiff Matthew Mooney's investment in Boeing was a single investment based on a single thesis: Boeing was lawfully growing is business with the 737 MAX.

Due to the structure of Plaintiff Matthew Mooney's investment in Boeing, its success depended upon Mooney having a full understanding of the scope of risks associated with his investment in Boeing. To wit, Mooney was especially attuned to Boeing's risk disclosures and statements about its 737 MAX, its largest and most important product.

From May 15, 2018 through January 5, 2021, Boeing vigorously and publicly denied acting improperly when obtaining its 737 MAX FAA certification.

Then, on January 6, 2021, Boeing entered into a Deferred Prosecution Agreement ("DPA") with the United States Department of Justice, Criminal Division, Fraud Section, and the United States Attorney's Office for the Northern District of Texas ("DOJ") whereby Boeing admitted to, "[f]rom at least in and around November 2016 through at least in and around December 2018, in the Northern District of Texas and elsewhere, Boeing, through Boeing Employee-1 and Boeing Employee-2, knowingly, and with the intent to defraud, conspired to defraud the FAA AEG." (DPA at A-5, attached hereto as Exhibit 1)  The FAA AEG is the FAA Aircraft Evaluation Group.

Boeing's admission rendered fraudulent its quarterly and annual reports filed with the SEC from November 2016 through and including December 31, 2020.  Specifically, Boeing's admission rendered fraudulent the exact reports and representations Plaintiffs had relied upon when considering and making their investments in Boeing securities.

In its SEC reports during that period, Defendant knowingly and willfully omitted to disclose that it was involved in a criminal scheme to defraud the United States government in order to obtain an improper certification for its most important product, the 737 MAX airplane and secure financial gain for itself.  Instead, Boeing only offered generic warnings that were insufficient considering the enormous risk created by its conspiracy to criminally conceal from the FAA the true nature of Boeing's 737 MAX.

Boeing's fraud is uncontroverted, was material to its business risk and needed to be included in its SEC filings' disclosures related to its business and its 737 MAX airplane in order to make those disclosures true and accurate.

Plaintiffs relied on Defendant's SEC filings when investing in Defendant's securities and were damaged as a direct and proximate result of the materialization of the concealed risk arising from Defendant's material omissions. Plaintiffs reviewed Boeing's SEC filings prior to making their investments in Boeing and relied on Boeing's disclosures and descriptions of its business risk. Had Boeing properly disclosed its criminal scheme to defraud the United States government, Plaintiffs would not have invested in Boeing's securities.

## JURISDICTION AND VENUE

1.     This Court has jurisdiction over this action under 28 U.S.C. §1331 and 15 U.S.C. §78aa. The federal district courts have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States. This Court has supplemental jurisdiction over Plaintiff's common law fraud by omission claim under 28 U.S.C. §1367(a).

2.     Venue is proper in this district pursuant to 28 U.S.C. §1391 and 15 U.S.C. §78aa, as a substantial portion of the acts and omissions giving rise to this action occurred in the Eastern District of Virginia. 28 U.S.C. §1391(b) and Boeing is found and transacts business in this district. Boeing's SEC filings were submitted electronically in this district.

## PARTIES

3.     Plaintiffs are married residents of the Commonwealth of Virginia. Matthew Mooney is a professional investor and member of the Virginia State Bar who engages in active investment research and makes investments based upon company filings, statements and disclosures. Plaintiff Matthew Mooney is a derivatives expert. He

began his career at Goldman, Sachs in 1998.  He has developed and managed derivatives trading operations and large portfolios.  He is a FINRA registered options principal and has taught financial derivatives at the graduate school level.  Plaintiff Matthew Mooney's specialty is developing complex derivative portfolios based on interlocking pieces of risk. The success of any portfolio is dependent upon accurate risk measures and, therefore, accurate corporate disclosures.

4.      Boeing develops, produces and markets commercial jet aircraft, as well as provides related support services to the commercial airline industry worldwide.  In 2017, 31% of Boeing's revenues were earned pursuant to U.S. government contracts.[3]  That year, Boeing operated in four reportable segments:  Commercial Airplanes (BCA); Defense, Space & Security (BDS); Global Services (BGS); and Boeing Capital (BCC). BDS' primary customer was the United States Department of Defense (U.S. DoD). Revenue from the U.S. DoD, including foreign military sales through the U.S. government, accounted for approximately 79% of BDS' 2017 revenues.[4]

## STATEMENT OF FACTS

### A.      The 737 MAX And Its FAA Certification Process

5.      In or around June 2011, Boeing began developing and marketing a new version of its Boeing 737 called the 737 MAX.  The 737 MAX was designed by Boeing as a competitive answer to a new version of an airplane developed by one of Boeing's top rivals in commercial airplanes, Company-1.  Like the new version of Company-1's airplane, the 737 MAX promised increased fuel efficiency over its prior version, the 737

---

[3] Boeing Form 10-K filed December 31, 2017 at Page 8.
[4] Boeing Form 10-K filed December 31, 2017 at Page 1.

Next Generation ("737 NG").  With this increased efficiency, the 737 MAX offered fuel-cost savings for airlines.  (Ex. 1, DPA at A-2)

6.      Before any U.S.-based airline could operate a new commercial airplane, U.S regulations required the FAA, an organization within the U.S. Department of Transportation, to evaluate and approve the airplane for commercial use.  Without this approval, a U.S.-based airline would not be permitted to operate the airplane.  (Ex. 1, DPA at A-2)

7.      As part of this evaluation and approval process, the FAA had to make two distinct determinations: (i) whether the airplane met U.S. federal airworthiness standards; and (ii) what minimum level of pilot training would be required for a pilot to fly the airplane for a U.S.-based airline.  These two determinations were made by entirely different groups within the FAA that were composed of different personnel with different organizational structures and different reporting lines.  (Ex. 1, DPA at A-2)

8.      The FAA AEG was principally responsible for determining the minimum level of pilot training required for a pilot to fly the airplane for a U.S.-based airline.  To make that determination, the FAA AEG compared the new version of the airplane (such as the 737 MAX) to a similar, prior version of the airplane (such as the 737 NG).  After evaluating the differences between the new and the prior versions of the airplane, the FAA AEG mandated the minimum level of pilot training known as "differences-training," for the new version.  (Ex. 1, DPA at A-3)

9.      Based on the nature and extent of the differences between the new and prior version of the airplane, the FAA AEG assigned a level of differences-training ranging from "Level A" through "Level E."  These levels of differences-training ranged

in rigor, with "Level A" being the least intensive and "Level E" the most intensive. As relevant here, "Level B" differences-training generally included computer-based training ("CBT"), and "Level D" differences-training generally included full-flight simulator training.  (Ex. 1, DPA at A-3)

10.     At the conclusion of the FAA's evaluation of the new version of the airplane, the FAA AEG published a Flight Standardization Board Report ("FSB Report"). Among other things, the FSB Report contained relevant information about certain airplane systems and parts that the airplane manufacturer was required to incorporate into airplane manuals and pilot-training materials for all U.S.-based airlines that would fly the airplane.  The FSB Report also contained the FAA AEG's differences-training determination.   (Ex. 1, DPA at A-3)

11.     Boeing's 737 MAX Flight Technical Team was principally responsible for identifying and providing to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB report.  (Ex. 1, DPA at A-4)

### B.     Boeing's Fraud

12.     Boeing admits in its DPA that from at least in and around November 2016 thorough at least in and around December 2018, in the Northern District of Texas and elsewhere, Boeing, though Boeing Employee-1 and Boeing Employee-2, knowingly, and with the intent to defraud, conspired to defraud the FAA AEG. (Ex. 1, DPA at A-5)

13.     The purpose of Boeing's conspiracy was, "to defraud the FAA AEG by impairing, obstructing, defeating, and interfering with the lawful function of the FAA AEG by dishonest means in connection with its differences-training determination for the

Boeing 737 MAX FSB report and its differences-training determination for the Boeing 737 MAX, in order to bring about a financial gain to Boeing and to benefit Boeing Employee-1 and Boeing Employee-2 in connection with the 737 MAX."  (Ex. 1, DPA at A-5)

14.     Boeing knew, "Level B" differences-training was significantly less expensive for airlines to complete than "Level D."  For example, a pilot could complete "Level B" differences-training from anywhere in the world in a matter of hours using a computer or tablet.  In contrast, a pilot could complete "Level D" differences-training only by appearing in person wherever the pilot's airline operated a full-flight simulator. Apart from the costs of acquiring one or more multimillion-dollar simulators and other related expenses, airlines that were required by the FAA AEG to train pilots on a full-flight simulator could also lose revenue that the pilot might otherwise have generated from flying airline passengers during that time.  Accordingly, if the FAA AEG required a less rigorous level—such as "Level B"—of differences-training for the 737 MAX in the 737 MAX FSB Report, the 737 MAX would be a more attractive option for Boeing's airline customers already flying the 737 NG than switching to an entirely new airplane, such as the new version of Company-1's airplane, as such customers would save significant money in pilot-training costs by transitioning to the 737 MAX.  (Ex. 1, DPA at A-6)

15.     Principally, for this reason, Boeing's stated objectives in designing the 737 MAX included securing the FAA AEG's determination to require no greater than "Level B" differences-training in the 737 MAX FSB Report.  (Ex. 1, DPA at A-6)

### 1.     The Maneuvering Characteristics Augmentation System ("MCAS")

16.     To achieve its promised fuel efficiency, the 737 MAX used larger engines than the 737 NG. These larger engines, and their placement under the airplane's wings, meant that the aerodynamics of the 737 MAX differed from those of the 737 NG. (Ex. 1, DPA at A-7)

17.     These different aerodynamics created a new handling characteristic for the 737 MAX that caused the 737 MAX's nose to pitch up during a certain flight maneuver called a high-speed, wind-up turn. A high-speed, wind-up turn generally involved sharply turning the airplane at high speed (approximately Mach 0.6-0.8) in a corkscrew-like pattern. (Ex. 1, DPA at A-7)

18.     A high-speed, wind-up turn was a "certification" maneuver, that is, a maneuver outside the limits of what the 737 MAX would be expected to encounter during a normal commercial passenger flight. Nevertheless, if Boeing did not fix the 737 MAX's pitch-up characteristic in high-speed, wind-up turns, the FAA could determine that the 737 MAX did not meet federal airworthiness standards. (Ex. 1, DPA at A-7)

19.     To fix this pitch-up characteristic, Boeing created MCAS and incorporated it as a part of the 737 MAX's flight controls. MCAS was an aircraft "part" within the meaning of Title 18, United States Code, Section 31(a)(7) and 38. In operation, MCAS would automatically cause the airplane's nose to pitch down by adjusting the 737 MAX's horizontal stabilizer (a horizontal tail located near the rear of the airplane). As originally designed, MCAS could only activate during a high-speed, wind-up turn. (Ex. 1, DPA at A-7)

20.     In or around June 2015, Boeing briefed the FAA AEG on MCAS. During the briefing, Boeing described MCAS as a system that could only activate during a high-

speed, wind-up turn. After the briefing, Boeing employees further discussed MCAS with an FAA AEG employee and reiterated to the FAA AEG employee the limited scope of MCAS. (Ex. 1, DPA at A-8)

21.    Subsequently, Boeing expanded MCAS's operational scope, including the speed range within which MCAS could activate, significantly altering its original design. Among other things, when the airplane registered a high angle of attack, the change expanded the speed range within which MCAS could activate from approximately Mach 0.6-0.8 to approximately Mach 0.2-0.8—that is, from only high-speed flight, which generally occurs at a lower altitude and in and around takeoff and landing. Boeing disclosed this expansion to FAA personnel, but only to those personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards. Boeing did not disclose the expansion to the FAA AEG personnel responsible for publishing the 737 MAX FSB Report and making the training-related determination. (Ex. 1, DPA at A-8)

### 2.    Boeing Advocates For "Level B" Differences-training

22.    On or about August 16, 2016, before the FAA AEG published the 737 MAX FSB Report, the FAA AEG issued a provisional "Level B" differences-training determination for the 737 MAX. At the time of this provisional determination, the FAA AEG was unaware that Boeing had expanded MCAS' operational scope. (Ex. 1, DPA at A-8-9)

23.    On or about the same day, Boeing Employee-1 recognized Boeing's achievement in an email to Boeing employees, including Boeing Employee-2, and wrote that the FAA AEG's provisional determination "culminates more than 3 years of tireless

13

and collaborative efforts across many business units" and that the 737 MAX program management "is VERY happy." (Ex. 1, DPA at A-9)

24.     As Boeing Employee-1 and Boeing Employee-2 knew, the FAA AEG based its provisional "Level B" differences-training for the 737 MAX in part on its understanding that MCAS could only activate during the limited operational scope of a high-speed, wind up turn. (Ex. 1, DPA at A-9)

25.     Boeing Employee-1 and Boeing Employee-2 also understood, as Boeing Employee-1 acknowledged in his email on or about August 16, 2016, that the FAA AEG's "Level B" differences determination for the 737 MAX was only a "provisional approval […] assuming no significant systems changes to the airplane." (Ex. 1, DPA at A-9)

26.     For example, in an email to Boeing employees including Boeing Employee-2 discussing a potential change to another part of the 737 MAX's flight controls on or about November 10, 2016, Boeing Employee-1 emphasized that '[o]ne of the Program Directives we were given was not to create any differences […]. This is what we sold to the regulators who have already granted us the Level B differences determination.  To go back to them now, and tell them there is in fact a difference […] would be a huge threat to that differences-training determination." (Ex. 1, DPA at A-9)

### 3.     Boeing's Conspiracy to Defraud The U.S. Government

27.     On or about November 15, 2016, during a test flight of the 737 MAX in a simulator, Boeing Employee-1 experienced what Boeing Employee-1 recognized as MCAS operating at lower speed.  Boeing Employee-1 further recognized that this lower-

speed operation was different from what Boeing had briefed and described to the FAA

AEG.  (Ex. 1, DPA at A-10)

28.    On or about the same day, Boeing Employee-1 and Boeing Employee-2

discussed MCAS in an internal Boeing electronic chat communication, writing in part:

> Boeing Employee-1: Oh shocker AlerT! [sic] /MCAS is now active down
> to [Mach] .2/ It's running rampant in the sim on me / at least that's what [a
> Boeing simulator engineer] thinks is happening
>
> Boeing Employee-2:  Oh great, that means we have to update the speed
> trim description in vol 2
>
> Boeing Employee-1:  so I basically lied to the regulators (unknowingly)
>
> Boeing Employee—2: it wasn't a lie, no one told us that was the case (Ex.
> 1, DPA at A-10)

29.    At this point, Boeing Employee-1 and Boeing Employee-2 recognized that

the FAA AEG was under the misimpression that MCAS operated only during a high-

speed, wind up turn and could not operate at lower Mach speeds, such as Mach 0.2.

Boeing Employee-1 and Boeing Employee-2 therefore knew, at least as of the time of

this chat communication, that the FAA AEG's provisional "Level B" differences-training

determination had been based in part on outdated and inaccurate information about

MCAS.  (Ex. 1, DPA at A-10)

30.    Boeing Employee-1 and Boeing Employee-2 also knew that MCAS's

expanded operational scope was relevant to the FAA AEG's decisions about the content

of the 737 MAX FSB Report, including whether to include information about MCAS.

Boeing Employee-1 and Boeing Employee-2 similarly understood that it was their

responsibility to update the FAA AEG about any relevant changes to the 737 MAX's

flight controls—such as MCAS's expanded operational scope.  (Ex. 1, DPA at A-11)

31.    Despite knowing that the FAA AEG had issued its provisional "Level B" determination without any awareness that MCAS's operational scope had been expanded to include high angle of attack conditions in nearly the entire speed range of ordinary commercial flight, Boeing Employee-1 and Boeing Employee-2 did not correct the FAA AEG's understanding of MCAS's operational scope or otherwise ensure that the FAA AEG's "Level B" determination was based on an accurate understanding of MCAS's operation. Instead, Boeing—through Boeing Employee-1 and Boeing Employee-2, intentionally withheld and concealed from the FAA AEG their knowledge of MCAS's expanded operational scope. (Ex. 1, DPA at A-11)

### 4.    Boeing Deceived the FAA AEG About MCAS Operational Scope and Told the FAA AEG to Delete MCAS from the 737 MAX FSB Report

32.    For example, shortly after the simulated test flight described in Paragraph 26, Boeing Employee-1 talked with FAA AEG Employee-1, who asked Boeing Employee-1 about the simulated test flight. Boeing Employee-1 intentionally withheld and concealed from FAA AEG Employee-1 the fact that MCAS's operational scope had been expanded beyond what the FAA AEG relied upon when it issued its provisional "Level B" differences-training determination for the 737 MAX. (Ex. 1, DPA at A-11)

33.    Around the time that Boeing Employee-1 and Boeing Employee-2 discussed MCAS's expanded operational scope, Boeing Employee-1 asked a Boeing senior engineer assigned to the 737 MAX program about MCAS's operational scope. The senior engineer confirmed to Boeing Employee-1 that MCAS could activate beyond the limited operational scope of high-speed, wind-up turn. The senior engineer suggested

that Boeing Employee-1 contact certain subject-matter experts at Boeing for more specific information about MCAS's operational scope.  (Ex. 1, DPA at A-12)

34.     On or about November 17, 2016, the FAA AEG emailed three Boeing employees, including Boeing Employee-1, Boeing Employee-2, and another Boeing employee, a draft of the forthcoming 737 MAX FSB Report.  That same day, Boeing Employee-1 asked Boeing Employee-2 and the other Boeing employee to review the draft 737 MAX FSB Report "for any glaring issues." (Ex. 1, DPA at A-12)

35.     On or about November 22, 2016, the other Boeing employee emailed the draft 737 MAX FSB Report back to the FAA AEG with proposed edits.  Boeing Employee-1 and Boeing Employee-2 were included on this email.  Boeing Employee-1 included a proposed edit to delete a reference to MCAS and wrote, "We agreed no to reference MCAS since it's outside normal operating envelope." Neither Boeing Employee-1 nor Boeing Employee-2 shared the fact of MCAS's expanded operational scope with the FAA AEG or otherwise corrected the FAA AEG's misimpression that MCAS's operational scope was limited to high-speed, wind-up turns.  (Ex. 1, DPA at A-12)

36.     In doing so, Boeing Employee-1 and Boeing Employee-2 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "agreed" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during he limited operational scope of a high-speed, wind-up turn—remained the same.  Boeing Employee-1 and Boeing Employee-2 withheld their knowledge of MCAS from the FAA AEG to avoid risking the FAA AEG taking any

action that could threaten the differences-training determination for the 737 MAX. (Ex. 1, DPA at A-12-13)

37.    On or about January 17, 2017, Boeing Employee-1 again reminded the FAA AEG in an email to delete any reference to MCAS from the forthcoming 737 MAX FSB Report, and wrote, "Flight Controls: Delete MCAS, recall we decided we weren't going to cover it […] since its way outside the normal operating envelope." Again Boeing Employee-1 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "decided" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during the limited operational scope of a high-speed, wind-up turn, remained the same. (Ex. 1, DPA at A-13)

38.    By concealing MCAS's expanded operational scope from the FAA AEG, Boeing, through Boeing Employee-1 and Boeing Employee-2 defrauded, impaired, obstructed, defeated and interfered with the FAA AEG's lawful function to evaluate MCAS and to include information about MCAS in the 737 MAX FSB Report. (Ex. 1, DPA at A-13)

39.    Based on Boeing's misleading statements, half-truths, and omissions to the FAA AEG about MCAS, and in reliance on those statements and omissions, the FAA AEG agreed to delete all information about MCAS from the 737 MAX FSB Report. (Ex. 1, DPA at A-13)

40.    From in and around January 2017 through in or around July 2017 (when the 737 MAX FSB Report was published), Boeing Employee-1 and Boeing Employee-2 set and caused to be sent emails to representatives of various Boeing airline customers that had agreed to purchase the 737 MAX, including major U.S.-based airlines. In these

emails, Boeing Employee-1 and Boeing Employee-2 or members of their 737 MAX

Flight Technical Team referenced and included drafts of the forthcoming 737 MAX FSB

Report and airplane manuals and pilot-training materials for Boeing's 737 MAX airline

customers. None of these items contained any information about MCAS, consistent with

Boeing Employee-1's and Boeing Employee-2's efforts to deceive the FAA AEG into

deleting information about MCAS. (Ex. 1, DPA at A-14)

> **5.** **The FAA AEG Published the 737 MAX FSB Report Without
> Any Information about MCAS and Required No Greater than
> "Level B" Differences-training**

41.     On or about July 5, 2017, the FAA AEG published the first 737 MAX

FSB Report, which included the FAA AEG's "Level B" differences-training

determination for the 737 MAX. (Ex. 1, DPA at A-14)

42.     Because of Boeing's intentional withholding of information from the FAA

AEG, the final version of the 737 MAX FSB Report lacked information about MCAS,

and relevant portions of this 737 MAX FSB Report were materially false, inaccurate, and

incomplete. In turn, airplane manuals and pilot-training materials for U.S.-based airlines

lacked information about MCAS, and relevant portions of these manuals and materials

were similarly materially false, inaccurate and incomplete as a result. (Ex. 1, DPA at A-

14)

43.     After the FAA AEG published the final version of the 737 MAX FSB

Report, Boeing continued to sell, and Boeing's U.S.-based airline customers were

permitted to fly, the 737 MAX. Pilots flying the 737 MAX for Boeing's airline

customers were not provided any information about MCAS in their airplane manuals and

pilot-training materials. (Ex. 1, DPA at A-14)

### 6.   Lion Air Flight 610: The First 737 MAX Crash

44.     On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly after takeoff into the Java Sea in Indonesia.  All 189 passengers and crew aboard died.  (Ex. 1, DPA at A-14)

45.     Following the Lion Air crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.  The FAA AEG also learned for the first time about MCAS's expanded operational scope.  (Ex. 1, DPA at A-15)

46.     In and around the same time, Boeing employees, including Boeing Employee-2, met with personnel from the FAA AEG to discuss, among other things, MCAS's operational scope.  After that meeting, Boeing Employee-2 told FAA AEG Employee-1 that he was previously unaware of MCAS's expanded operational scope and otherwise misled FAA AEG Employee-1 about Boeing Employee-2's prior knowledge of MCAS.  (Ex. 1, DPA at A-15)

47.     Also, in and around the same time, Boeing Employee-2 caused Boeing to present a false and misleading presentation to the FAA AEG about MCAS.  Boeing investigated, among other things, what information Boeing Employee-1 and Boeing Employee-2 provided to the FAA AEG about MCAS.  In connection with this investigation, Boeing Employee-2 caused Boeing to represent in a presentation to the FAA AEG that, during the training-evaluation process, Boeing and the FAA AEG had "discussed and agreed on [the] removal of MCAS" from the 737 MAX FSB Report and associated materials.  This representation was misleading because Boeing Employee-2 had failed to disclose the "shocker alert" chat communication and the fact that the FAA AEG was deprived of relevant information about MCAS.  (Ex. 1, DPA at A-15)

48.     Following the Lion Air crash, Boeing proposed changes to the operational scope of MCAS, and the FAA AEG worked with Boeing to evaluate these changes to MCAS for purposes of pilot training.  (Ex. 1, DPA at A-15)

### 7.     Ethiopian Airlines Flight 302: The Second 737 MAX Crash

49.     On March 10, 2019, Ethiopian Airlines Flight 302, a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia.  All 157 passengers and crew on board died.  Following the Ethiopian Airlines crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.

50.     On March 13, 2019, the 737 MAX was officially grounded in the United States, indefinitely halting further flights of this airplane by any U.S.-based airline.

### BOEING ADMITS TO ENGAGNIG IN A CRIMINAL SCHEME

51.     On January 6, 2021, Boeing executed its DPA whereby it acknowledged and agreed that the United States Department of Justice, Criminal Division, Fraud Section would file a one-count criminal Information in the United States District Court for the Northern District of Texas charging Boeing with Conspiracy to Defraud the United States, in violation of Title 18, USC §371.  (Ex. 1, DPA at 1)

52.     In the DPA, Boeing "admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents charged in the Information, as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate."  (Ex. 1, DPA at 2)

53.     In the Statement of Facts it states, "[f]rom at least in and around November 2016 through at least in and around December 2018, in the Northern District

of Texas and elsewhere, Boeing, through Boeing Employee-1 and Boeing Employee-2, knowingly, and with the intent to defraud, conspired to defraud the FAA AEG." (Ex. 1, DPA at A-5)

54.     Per the DPA, Boeing agreed to pay a Criminal Monetary Penalty of $243,600,000 to the United States Treasury.

## BOEING'S SPECIFIC MISREPRESENTATIONS VIA OMISSION

55.     On January 6, 2021, Boeing, for the first time, admitted to engaging in a criminal scheme to defraud the United States government related to its effort to obtain an improper 737 MAX certification from the FAA.

56.     Boeing's omission and/or failure to disclose its criminal scheme in its SEC filings when (1) discussing its interactions with the United States government; (2) discussing risk factors associated with an investment in Boeing's securities; and (3) discussing the 737 MAX renders the following disclosures fraudulent by omission:

### A.     Boeing's Form 10-K for the Period Ending December 31, 2017

57.     In its Form 10-K dated December 31, 2017 ("2017 Annual Report"), Boeing included "Risk Factors" in which it included the generic warning, "we are subject to extensive regulation under the laws of the United States and its various states, as well as other jurisdictions in which we operate. As a result we are sometimes subject to government inquiries and investigations of our business due, among other things, to our business relationships with the U.S. government, the heavily regulated nature of our industry, and in the case of environmental proceedings, our current or past ownership of certain property. Any such inquiry or investigation could potentially result in an adverse

22

ruling against us, which could have a material impact on our financial position and results of operations." (Boeing Form 10-K filed December 31, 2017 at Page 12)

58.     Boeing's risk disclosure materially understated its regulatory risk by not disclosing that it was then presently engaged in a criminal scheme to defraud the U.S. government. At the time Boeing made the aforementioned generic disclosure it was working to deceive the FAA and hide MCAS, a critical new part of its 737 MAX airplane. The subsequent materialization of Boeing's concealed risk cost the company billions of dollars in fines, restitution, and lost profits. In addition, Boeing's fraud led to two catastrophic crashes, the grounding of its 737 MAX and immeasurable reputational damage.

59.     A proper disclosure including the revelation that Boeing was actively working to defraud the U.S. government in order to obtain 737 MAX certification that did not require pilots to be aware of MCAS would have materially altered all reasonable investor's risk calculations regarding an investment in Boeing and the safety of the 737 MAX program.

60.     In its 2017 Annual Report, Boeing discusses its Program Accounting Quantity. The Accounting Quantity is Boeing's estimate of the quantity of airplanes that will be produced for delivery under existing and anticipated contracts. Boeing stated that it had 11,400 cumulative, firm 737 orders. Boeing noted, "[t]he accounting quantity for the 737 program increased by 800 units during 2017 due to the program's normal progress of obtaining additional orders and delivering airplanes. We are currently producing at a rate of 47 per month and plant to increase to 52 per month in 2018. We plan to further increase the rate to 57 per month in 2019. We delivered the first 737

MAX 8 in may 2017 and announced the launch of the 737 MAX 10 in June 2017."
(Boeing Form 10-K filed December 31, 2017 at Page 27)

61.     Boeing's Accounting Quality statements regarding the 737 MAX were
deceptive in that they omit the disclosure that the 737 MAX FAA certification was
procured by fraud.  Boeing stated that the "accounting quantity for each program may
include units that have been delivered, undelivered units under contract, and units
anticipated to be under contract in the reasonable future (anticipated orders).  In
developing total program estimates, all of these items within the accounting quantity
must be considered."  By omitting its fraud, Boeing misrepresented the current value and
probability of its future orders.  Boeing admitted that "[e]stimation of each program's
accounting quantity takes into account several factors that are indicative of demand for
that program, including firm orders, letters of intent from prospective customers and
market studies."  (Boeing Form 10-K filed December 31, 2017 at Page 27)  The
disclosure that Boeing obtained certification by fraud would have, and did, materially
effect the value of the 737 MAX program and demand for the airplane.  By hiding that
material fact from Plaintiffs, Boeing misrepresented the value of its accounting quantity.

62.     Had Boeing properly disclosed that it had intentionally tricked the FAA
into certifying its 737 MAX with the wrong differences-training level and, therefore, had
effectively hid the 737 MAX's MCAS system from pilots, reasonable investor's would
have applied a higher discount to the certainty of Boeing's sales.

63.     By failing to disclose its criminal scheme, Boeing misrepresented the
program development time horizons for its 737 MAX aircraft on page 28 of its 2017
Annual Report.  On that page, Boeing included the following statement:

The development and ongoing production of commercial aircraft is extremely complex, involving extensive coordination and integration with suppliers and highly-skilled labor from employees and other partners.   Meeting or exceeding our performance and reliability standards, as well as those of customers and regulators, can be costly and technologically challenging.  In addition, the introduction of new aircraft and derivatives, such as the 787-10 or and 777X, involves increased risks associated with meeting development, production and certification schedules.  As a result, our ability to deliver aircraft on time, satisfy performance and reliability standards and achieve or maintain, as applicable program profitability is subject to significant risks.  Factors that could result in lower margins (or a material charge if an airplane program has or is determined to have reach-forward losses) include the following: changes to the program accounting quantity, customer and model mix, production costs and rates, changes to price escalation factors due to changes in the inflation rate or other economic indicators, performance or reliability issues involving completed aircraft, capital expenditures and other costs associated with increasing or adding new production capacity, learning curve, additional change incorporation, achieving anticipated cost reductions, flight test and certification schedules, costs, schedule and demand for new airplanes and derivatives and status of customer claims, supplier assertions and other contractual negotiations.   While we believe the cost and revenue estimates incorporated in the consolidated financial statements are appropriate, the technical complexity of our airplane programs creates financial risk as additional completion costs may become necessary or scheduled delivery dates could be extended, which could trigger termination provisions, order cancellations or other financially significant exposure.  (Boeing Form 10-K filed December 31, 2017 at Page 29)

64.    Boeing's Additional Considerations is misleading because it does not reference the 737 MAX program's most important "factor that could result in lower margins": that Boeing defrauded the FAA to obtain an improper differences-training certification for its 737 MAX that effectively hid MCAS from pilots.  In fact, Boeing's glancing reference to "flight test and certification schedules" is itself misleading because it fails to accurately disclose those risks.  Once Boeing's customers became aware of its fraud Boeing suffered a deluge of 737 MAX order cancellations. It is not hyperbole to

state that the biggest "Additional Consideration" was Boeing's fraud aimed at the FAA to secure an improper 737 MAX certification.

65.   Plaintiffs relied on the truth and accuracy of Boeing's 2017 Annual report when considering their investment in Boeing shares. By choosing to disclose risks associated with an investment in its securities, Boeing had a duty to disclose all material risks known to it at the time of disclosure. At the time of the 2017 Annual Report's publication, risk associated with Boeing's criminal conspiracy was the most important and impactful risk for Boeing to disclose to investors. Instead of making its necessary disclosure, Boeing remained silent.

**B.      Boeing's Form 10-Q for the Period Ending March 31, 2018**

66.   In Boeing's Form 10-Q for the period ending March 31, 2018 ("2018 Q1 Quarterly Report"), Boeing stated "[t]here have been no material changes in our risk factors from those disclosed in Part 1, Item 1A. Risk Factors in our Annual Report on Form 10-K for the year ended December 31, 2017. (2018 Q1 Quarterly Report at Page 48)

67.   Boeing's 2018 Q1 Quarterly Report is misleading because it is silent and omits to disclose Boeing's criminal scheme to deceive the FAA. At the time of the 2018 Q1 Quarterly Report's publication, Boeing's fraud was ongoing. It had a duty to disclose its criminal enterprise to make its referenced Risk Factors not misleading.

68.   Given the existence of its criminal conspiracy, Boeing's 2018 Q1 Quarterly Report's generic warnings were insufficient to truthfully inform a reasonable investor of the risk associated with an investment in Boeing.

69.     Boeing's 2018 Q1 Quarterly Report has an "Additional Considerations" paragraph on page 39-40 that is identical to the "Additional Considerations" paragraph in its 2017 Form 10-K.  The 2018 Q1 Quarterly Report "Additional Considerations" paragraph is misleading for the same reason as the 2017 Form 10-K "Additional Considerations" paragraph: it omits the disclosure of Boeing's ongoing fraud to deceive the U.S. government.  Boeing's omission is especially egregious because it does disclose the risk of "flight tests and certification schedules."  Boeing admits that variability regarding certification is a risk.  Boeing chose to highlight and discuss certification risk. Therefore, it had a duty to fully and completely disclose its known risks related to the 737 MAX's FAA certification.   Boeing's engagement in criminal fraud related to its 737 MAX certification with the FAA needed to be disclosed in order to make its "certification" risk disclosure not misleading.

70.     On page thirty-nine of its 2018 Q1 Quarterly Report, Boeing disclosed its Accounting Quantity and Firm Orders by program.  The 737 disclosure was misleading by omitting to disclose that the 737 MAX aircraft that were delivered were certified via fraud.  This tarnish meant that the deliveries were revocable and that forward "undelivered units under firm orders" were not firm.  All 737 MAX's orders were subject to risk of revocation due to Boeing's fraud.  The 737 MAX was the product of Boeing's criminal enterprise.  It was not the product of lawful business activity and, therefore, its sales were subject to revocation and/or actions for additional damages.

71.     By choosing to note 737 MAX sales, Boeing was obligated to disclose that its 737 MAX was the product of its criminal conspiracy.  A reasonable investor's calculation of the probability of risk would be effected by such disclosure.

72.     Plaintiffs relied on Boeing's 2018 Q1 Quarterly Report disclosures when measuring the risk of investing in Boeing and subsequently making investments. Plaintiff Matthew Mooney relied on Boeing's 2018 Q1 Quarterly Report to determine the value of the 737 MAX program to Boeing. Plaintiff Matthew Mooney's determination of value was based upon the surety of 737 MAX sales and Boeing's representations about the success and the progress of the 737 MAX program. Had Boeing disclosed that its 737 MAX program was certified improperly and by trick as a result of its criminal conspiracy perpetrated against the FAA, Plaintiffs would not have invested in Boeing's securities.

73.     A critical consideration informing Plaintiff Matthew Mooney's decision to invest in Boeing was Boeing's representation that its 737 MAX was a better economic deal than its Airbus competitor. The better economic deal was based on the 737 MAX not needing additional pilot training. That gave Boeing a competitive edge.

74.     The news that Boeing had secured its competitive edge by fraud would have significantly altered the mix of Plaintiff Matthew Mooney's decision calculus. Plaintiff Mooney specifically relied on the veracity of Boeing's statements about its 737 MAX program when deciding to invest in Boeing.

**C.     Boeing's Form 10-Q for the Period Ending June 30, 2018**

75.     In Boeing's Form 10-Q for the period ending June 30, 2018 ("2018 Q2 Quarterly Report"), Boeing states "[t]here have been no material changes in our risk factors from those disclosed in Part 1, Item 1A. Risk Factors in our Annual Report on Form 10-K for the year ended December 31, 2017. (2018 Q2 Quarterly Report at Page 56)

76.     Boeing's 2018 Q2 Quarterly Report is misleading because it is silent and fails to disclose Boeing's criminal scheme to deceive the FAA into awarding its 737 MAX an improper differences-training certification.  At the time of the 2018 Q2 Quarterly Report's publication, Boeing's fraud was ongoing.  It had a duty to disclosure its criminal enterprise to make its referenced Risk Factors not misleading.

77.     On page forty-five of Boeing's 2018 Q2 Quarterly Report it lists its current order backlog at $415,723 million at June 30, 2018.  Boeing's statement is deceptive in that it fails to disclose that the backlog includes orders for 737 MAX airplanes that are the subject and product of its criminal enterprise.  Boeing defines "total backlog" as "the estimated transaction prices on unsatisfied and partially satisfied performance obligations to our customers where we believe it is probable that we will collect the consideration due and where no contingencies remain before we and the customer are required to perform."  Boeing's customers were never required to take delivery of products that were unlawfully certified.  Boeing's "total backlog" representation was misleading.  Specifically, Boeing's failure to disclose its criminal conspiracy altered reasonable investor's calculation of the probability that Boeing would "collect the consideration due."  A lawful product has a higher probability of securing sale than an unlawful product.  Plaintiff Mooney reviewed and relied on Boeing's representation of probable sales of its airplanes when deciding to invest in Boeing's securities.  Had Boeing disclosed that its ability to sell its 737 MAX was procured from the FAA via a criminal conspiracy, Plaintiff Mooney would not have invested in Boeing.

78.     Boeing's 2018 Q2 Quarterly Report Accounting Quality representations on page forty-five are misleading for the same reasons as its prior 2018 Q1 Quarterly

Report Accounting Quality representations.  In order to make its disclosures accurate,

Boeing needed to disclose that its very ability to sell its 737 MAX on its preferred terms

was the product of deceit.

### D.   Boeing's Form 10-Q for the Period Ending September 30, 2018

79.    In Boeing's Form 10-Q for the period ending September 30, 2018 ("2018

Q3 Quarterly Report"), Boeing stated "[t]here have been no material changes in our risk

factors from those disclosed in Part 1, Item 1A. Risk Factors in our Annual Report on

Form 10-K for the year ended December 31, 2017. (2018 Q3 Quarterly Report at Page

57)

80.    Boeing's 2018 Q3 Quarterly Report is misleading because it is silent and

omits to disclose Boeing's criminal scheme to deceive the FAA.  At the time of the 2018

Q3 Quarterly Report's publication, Boeing's fraud was ongoing.  It had a duty to

disclosure its criminal enterprise to make its referenced Risk Factors not misleading.

Boeing's most important product, the 737 MAX with a "Level B" differences-training

requirement was a fraud.

81.    Boeing admits that its, "stated objectives in designing the 737 MAX

included securing FAA AEG's determination to require no greater than "Level B"

differences-training in the 737 MAX FSB Report."  (Ex. 1, DPA at A-6)  Boeing's

product was a 737 MAX _with_ "Level B" differences-training.  Boeing obtained its

product by fraudulent means.  Failure to disclose its fraud caused investors, including

Plaintiffs, to overvalue Boeing's most important product.

82.    On page forty-five of Boeing's 2018 Q3 Quarterly Report it lists its

current order backlog at $413,064 million at September 30, 2018.  Boeing's statement is

deceptive in that it omits to disclose that the backlog includes orders for 737 MAX airplanes that are the subject and product of its criminal enterprise. The 737 MAX with 'Level B' differences-training was a fraud. Boeing defines "total backlog" as "the estimated transaction prices on unsatisfied and partially satisfied performance obligations to our customers where we believe it is probable that we will collect the consideration due and where no contingencies remain before we and the customer are required to perform." Boeing's customers were never required to take delivery of products that were unlawfully certified. Boeing's "total backlog" representation was misleading given that it was based on the sale of a fraudulent product.

83. Boeing's 2018 Q3 Quarterly Report Accounting Quality representations on page forty-five are misleading for the same reasons as its prior 2018 Q1 Quarterly Report Accounting Quality representations.

84. Plaintiff Matthew Mooney read and relied on Boeing's 2018 Q3 Quarterly Report when measuring the risk associated with an investment in Boeing securities. Had Boeing properly disclosed that it had secured its most important product, the 737 MAX with 'Level B' differences-training and the right to sell that product by fraud, Plaintiff Matthew Mooney would not have subsequently invested in Boeing securities. The fact that Boeing's most valuable new product was a fraud significantly altered the mix of information and the risks associated with an investment in Boeing.

**E.   Boeing's Form 10-K for the Period Ending December 31, 2018**

85. Boeing's Form 10-K for the period ending December 31, 2018 ("2018 Annual Report") omitted to disclose Boeing's ongoing scheme to defraud the United States government. Importantly, Boeing's form 10-K continued to incorrectly describe

its 737 MAX. The product: the 737 MAX with 'Level B' differences-training was a fraud, procured via a criminal conspiracy and Boeing's ability to sell it was the result of a criminal scheme.

86.     On page one of its 2018 Annual Report, Boeing states, "[d]evelopment continues on certain 737 MAX derivatives and the 777X program." Boeing's representation of its 737 MAX development is misleading by omitting to disclose its criminal activity. The 737 MAX and Boeing's ability to sell it were the result of a criminal fraud. By choosing to discuss 737 MAX "development," Boeing was obliged to disclose the criminal component of that development.

87.     Thereafter, Boeing states on page three, "[o]ur businesses are heavily regulated in most of our markets. We deal with numerous U.S. government agencies and entities, including but not limited to all of the branches of the U.S. military, NASA, the Federal Aviation Administration (FAA) and the Department of Homeland Security." Implicit in Boeing's statement is that it followed the law.

88.     By choosing to discuss its relationship with U.S. government agencies and entities, Boeing had a duty to disclose that it was actively defrauding the FAA. By omitting that disclosure, Boeing's statement is misleading.

89.     Two paragraphs later, on page three, Boeing states, "[i]n the U.S., our commercial aircraft products are required to comply with FAA regulations governing production and quality systems, airworthiness and installation approvals, repair procedures and continuing operational safety." Boeing's generic risk disclosure is misleading given the current existence of its effort to not comply with FAA regulations and the law.

90.     By choosing to discuss the risk and importance of complying "with FAA regulations governing production and quality systems," Boeing had a duty to speak completely and truthfully.  By omitting to disclose that (1) its 737 MAX did not comply with 'Level B' differences-training parameters; and (2) Boeing was actively engaged in a criminal fraud to deceive the FAA that it did comply with those parameters, Boeing's statement gave the false impression that it was complying with FAA regulations.

91.     In its risk factors at page six, Boeing warns, "[o]perational issues, including delays or defects in supplier components, failure to meet internal performance plans, or delays or failures to achieve required regulatory certifications, could result in significant out-of-sequence work and increased production costs, as well as delayed deliveries to customers, impacts to aircraft performance and/or increased warranty or fleet support costs."  This disclosure is incomplete by omitting to disclose Boeing's certification fraud.  Boeing's criminal fraud posed a real risk to its "required regulatory certifications."  By omitting its disclosure Boeing gave the false impression that it was operating lawfully.

92.     In its risk factors at page six, Boeing states, "[d]eveloping and manufacturing commercial aircraft that meet or exceed our performance and reliability standards, as well as those of customers and regulatory agencies, can be costly and technologically challenging.  These challenges are particularly significant with newer aircraft programs.  Any failure of any Boeing aircraft to satisfy performance or reliability requirements could result in disruption to our operations, higher costs and/or lower revenues."  Boeing's statement is misleading by omitting to disclose that its 737 MAX was already failing to meet or exceed regulatory standards.  Boeing's fraud was aimed at

deceiving the FAA of the 737 MAX's true characteristics in order to secure 'Level B' differences-training certification by trick. Moreover, complying with regulatory agencies was made even more challenging by Boeing's fraud. Disclosure of Boeing's criminal acts was necessary to make this risk disclosure accurate.

93.     On page eleven Boeing states, "we are subject to extensive regulation under the laws of the United States and its various states, as well as other jurisdictions in which we operate. As a result, we are sometimes subject to government inquiries and investigations of our business due, among other things, to our business relationship with the U.S. government, the heavily regulated nature of our industry, and in the case of environmental proceedings, our current or past ownership of certain property." Boeing's disclosure is misleading by omitting to disclose its criminal fraud aimed at the FAA. This omission materially effects the scope and nature of this disclosure. In truth, Boeing's risk of regulatory investigation and scrutiny was much higher due to its fraud.

94.     On page twelve Boeing warns that it may be, "unable to obtain debt to fund our operations and contractual commitments at competitive rates, or commercially reasonable terms or in sufficient amounts." Boeing states that a, "number of factors could cause us to incur increased borrowing costs and to have greater difficulty accessing public and private markets for debt. These factors include disruptions or declines in the global capital markets and/or a decline in our financial performance, outlook or credit ratings. The occurrence of any or all of these events may adversely affect our ability to fund our operations and contractual or financing commitments." Boeing's disclosure is deceptive in that it omits to disclose its criminal scheme. Boeing's illegal conduct posed

the most significant risk to its liquidity and access to funding sources. By choosing to discuss risks to future funding, Boeing was required to disclose its criminal scheme.

95.     On page twelve Boeing warned that, "[o]ur insurance coverage may be inadequate to cover all significant risk exposures." This disclosure is deceptive by failing to include notice of Boeing's fraud. None of Boeing's insurance policies would protect it from the consequences of its criminal conduct. The costs of Boeing's criminal acts fell directly upon shareholders. By choosing to discuss insurance coverage risks, Boeing was required to disclose its actions that posed the greatest risk to (1) maintaining its insurance; (2) the cost of coverage; and (3) risks existing outside of coverage that may be borne by investors.

96.     Boeing's Accounting Quantity table on page twenty-eight is deceptive by suggesting that its Accounting Quantity methodology did not disclose that its 737 MAX was certified via its criminal fraud. Boeing's 737 MAX certification fraud nullified and/or devalued all agreements it had with customers to purchase the 737 MAX. By omitting to disclose its fraud, Boeing misrepresented its Accounting Quantity as more probable that it actually was.

97.     Boeing's "Additional Considerations" warning on page twenty-nine is deceptive by omitting to disclose its 737 MAX certification scheme. The disclosure notes that "flight and certification schedules" are a factor that "could result in lower margins." That factor was materially increased due to Boeing's fraud.

98.     Boeing does not include any reference to its 737 MAX certification scheme in its 2018 Annual Report. Its absence renders the entire report misleading. The 737 MAX was Boeing's most important new product. By failing to disclose its criminal

enterprise, Boeing misled investors, including Plaintiffs, into believing that its results were free from criminal risk or penalty and that its 737 MAX, and Boeing's ability to sell its 737 MAX airplane, was a lawful product and endeavor.

99.     Plaintiff Matthew Mooney read and relied on Boeing's 2018 Annual Report when calculating risk associated with his investment in Boeing. The 2018 Annual Report deceptively represented Boeing's 737 MAX with 'Level B' differences-training as a lawful product key to Boeing's success. Had Boeing properly disclosed that its 737 MAX with 'Level B' differences-training was a fraud, obtained by a criminal scheme to trick the FAA, Plaintiff Matthew Mooney would not have subsequently invested in Boeing securities.

F.    **Boeing's Form 10-Q for the Period Ending March 31, 2019**

100.     In Boeing's Form 10-Q for the period ending March 31, 2019 ("2019 Q1 Quarterly Report"), on page fifty Boeing stated:

> On March 13, 2019, the Federal Aviation Administration (FAA) issued an order to suspend operations of all 737 MAX aircraft in the U.S. and by U.S. aircraft operators following two recent fatal 737 MAX accidents. Non-U.S. civil aviation authorities have issued directives to the same effect. We are working closely with the relevant government authorities to support both accident investigations. We are also fully cooperating with other U.S. government investigations related to the accidents.

In light of Boeing's admission that it criminally defrauded the FAA incident to obtaining 737 MAX certification, its March 31, 2019 statement was a lie. Boeing was not "fully cooperating." It was concealing its fraud. Moreover, by omitting to disclose its fraud, its statement of cooperation was materially misleading.

101.     Boeing admitted on page fifty that, "[a]ny prolonged grounding of the 737 MAX aircraft or delays in one or more jurisdictions to achieve required authorizations to

return to service, could have a material adverse effect on our financial position, results of operations, or cash flows." To avoid this, Boeing continued to lie about its scheme.

102.    Boeing never disclosed its 737 MAX certification fraud in its 2019 Q1 Quarterly Report.

**G.    Boeing's Form 10-Q for the Period Ending June 30, 2019**

103.    In Boeing's Form 10-Q for the period ending June 30, 2019 ("2019 Q2 Quarterly Report"), at page fifty-two Boeing stated, "we are fully cooperating with all ongoing governmental and regulatory investigations and inquiries relating to the accidents and the 737 MAX program." In light of Boeing's admission that it was perpetrating a fraud on the FAA from November 2016 through and including December 2018 related to 737 MAX certification, Boeing's June 30, 2019 statement is a lie. Boeing did not disclose its fraud.

104.    On page fifty-four, Boeing stated:

> On March 13, 2019, the Federal Aviation Administration (FAA) issued an order to suspend operations of all 737 MAX aircraft in the U.S. and by U.S. aircraft operators following two recent fatal 737 MAX accidents. Non-U.S. civil aviation authorities have issued directives to the same effect. We are working closely with the relevant government authorities to support both accident investigations and are also fully cooperating with other U.S. government investigations related to the accidents.

In light of Boeing's admission that it criminally defrauded the FAA incident to obtaining 737 MAX certification, its June 30, 2019 statement was a lie. Boeing was not "fully cooperating." It was concealing its fraud. Moreover, by omitting to disclose its fraud, its statement of cooperation was materially misleading.

105.    On page fifty-four Boeing stated, "Any unanticipated delays in certification and/or return to or other liabilities associated with the accidents or grounding

37

[of the 737 MAX] could have a material adverse effect on our financial position, results of operations, and/or cash flows." Boeing's disclosure is materially misleading by omitting to disclose its fraud. That fraud, its discovery and its consequences posed a significant risk of further adverse effects to Boeing's financial position.

106.    Thereafter, on page fifty-four, Boeing states, "The FAA and other civil aviation authorities will determine the timing and conditions of return to service [for the 737 MAX]. However, for purposes of our second-quarter financial results, we have assumed that regulatory approval of 737 MAX return to service in the U.S. and other jurisdictions begins early in the forth quarter of 2019." Boeing's risk disclosure is misleading by omitting to disclose its criminal fraud. That fraud, and its discovery, could and did have a material effect on the 737 MAX's certification.

107.    On page fifty-five Boeing warned that its fourth quarter 2019 estimate "reflects its best estimate at this time based on factors such as the expected effort required to complete the required software upgrades and estimated duration of the certification process." This was a lie. Boeing knew of its fraud and was aware that its discovery may cause significant delays and/or completely scuttle the certification process. In order to make its statement accurate, Boeing needed to disclose its criminal scheme. It did not.

108.    Boeing never disclosed its 737 MAX certification fraud in its 2019 Q2 Quarterly Report.

### H.    Boeing's Form 10-Q for the Period Ending September 30, 2019

109.    In Boeing's Form 10-Q for the period ending September 30, 2019 ("2019 Q3 Quarterly Report"), on page fifty-six Boeing stated:

> On March 13, 2019, the Federal Aviation Administration (FAA) issued an order to suspend operations of all 737 MAX aircraft in the U.S. and by

U.S. aircraft operators following two recent fatal 737 MAX accidents. Non-U.S. civil aviation authorities have issued directives to the same effect. We are working closely with the relevant government authorities to support both accident investigations and are fully cooperating with other U.S. government investigations related to the accidents.

In light of Boeing's admission that it criminally defrauded the FAA incident to obtaining 737 MAX certification, its September 30, 2019 statement was a misrepresentation. By omitting to disclose its fraud, its statement of cooperation was materially misleading to investors. Boeing engaged in criminal conduct incident to its 737 MAX certification. By withholding that information from investors, Boeing was misrepresenting that it was assisting with the investigation rather than concealing its role as the primary bad actor.

110.    Thereafter, Boeing stated, "[i]n connection with the effort to return the 737 MAX to service, we have developed software updates for the 737 MAX together with associated pilot training and supplementary education program. We continue to work with the FAA and non-U.S. civil aviation authorities to complete remaining steps toward certification and readiness for return to service, including addressing their questions on the software updates and how pilots will interact with the airplane controls and displays in different flight scenarios." Boeing's statement omits reference to its fraud and is misleading. It suggests that the scope of the issue is limited to "software updates" and Boeing is without culpability. Both representations are wrong. The only way for Boeing to fully disclose its 737 MAX regulatory risk and risk related to the 737 MAX's return to service was to disclose its fraud. It did not.

**I.      Boeing's Form 10-K for the Period Ending December 31, 2019**

111.    In Boeing's Form 10-K for the period ending December 31, 2019 ("2019 Annual Report"), on page five Boeing stated:

The 737 MAX fleet is currently grounded, and we have temporarily suspended production of the 737 MAX. We are subject to a number of risks and uncertainties related to the 737 MAX. These risks include uncertainties regarding the timing and conditions of the 737 MAX regulatory approvals, delays in the resumption of production, lower than planned production rates and/or delivery rates, increased consideration to customers, increased supplier costs and supply chain health, changes to the assumptions and estimates made in our financial statements regarding the 737 program, and potential outcomes of various 737 MAX-related legal proceedings and government investigations.

Boeing's disclosure misrepresents its 737 MAX risk by omitting to include disclosure about its 737 MAX certification fraud. Boeing's scheme was one of its biggest risks and completely absent from its disclosures thereby rendering the disclosure misleading. The disclosure of Boeing's fraud was necessary for investors to accurately understand the scope of the issue and Boeing's culpability and, specifically, Boeing's risk of criminal liability.

112.    Boeing stated on page five that it was, "fully cooperating with the U.S. government investigations related to the accidents and the 737 MAX, including investigations by the U.S. Department of Justice and the Securities and Exchange Commission. Any adverse results with respect to any such litigation could have a further material impact on our financial position, results of operations and/or cash flows." Boeing's disclosure was misleading in that omits disclosure of Boeing's fraud. Boeing's fraud significantly increased the likelihood of an "adverse result." In order to provide an accurate disclosure, Boeing needed to disclose its criminal scheme. It did not.

113.    Boeing states on page seven that the, "737 program has also experienced significant disruption due to the grounding of the 737 MAX and associated suspension of the 737 MAX production. As a result, our ability to deliver the aircraft on time, satisfy

regulators and customer requirements, and achieve or maintain, as applicable, program

profitability is subject to significant risks." A key risk was Boeing's fraud. Boeing never

disclosed its criminal fraud in its 2019 Annual Report thereby rendering the report

misleading.

### J.   Boeing's Form 10-Q for the Period Ending March 31, 2020

114.   In Boeing's Form 10-Q for the period ending March 31, 2020 ("2020 Q1

Quarterly Report"), Boeing stated on page 15, Note 11:

> On March 13, 2019, the Federal Aviation Administration (FAA) issued an
> order to suspend operations of all 737 MAX aircraft in the U.S. and by
> U.S. aircraft operators following two fatal 737 MAX accidents. Non-U.S.
> civil aviation authorities have issued directives to the same effect.
> Deliveries of the 737 MAX have been suspended until clearance is granted
> by the appropriate regulatory authorities. In addition, multiple legal
> actions have been filed against us as a result of the accidents. We are fully
> cooperating with the U.S. government investigations related to the
> accidents and the 737 MAX program, including investigations by the U.S.
> Department of Justice and Securities an Exchange Commission, the
> outcome of which may be material. We cannot reasonably estimate a
> range of loss, if any, not covered by available insurance that may result
> given the current status of the lawsuits, investigations and inquiries related
> to the 737 MAX.

Boeing's statement is misleading given that it omits any disclosure of its 737 MAX

certification fraud. Boeing's fraud completely altered the complexion of Boeing's risk

and needed to be disclosed to make its risk disclosure correct.

115.   From October 1, 2017 though March 31, 2020, Boeing never disclosed

that it had engineered and implemented a criminal scheme to defraud the United States

government. At every turn, Boeing minimized its role and defended its practices. Each

and every one of Boeing's SEC filings from the fourth quarter of 2017 to the first quarter

of 2020 were misleading by omitting to disclose the material truth of its criminal fraud.

## PLAINTIFFS RELIED ON BOEING'S MARKET PICE AND DECEPTIVE SEC FILINGS AND INVESTED IN BOEING

116. Plaintiffs relied on both Boeing's market trading price and Boeing's SEC filings when investing in Boeing securities. Specifically, Plaintiffs relied on Boeing's representations regarding the scope of its activity and the risks associated with an investment in its securities. Plaintiffs relied on Boeing's statements about risk when measuring the volatility cost of a potential gain of a Boeing investment and its implied volatility. Boeing omitted to disclose its criminal scheme thereby misrepresenting that it was only engaged in lawful activity. The volatility and risk differential between lawful and unlawful activity is material. Plaintiffs invested in Boeing based on Boeing's lie.

117. Plaintiff Matthew Mooney is a professional investor in the business of reviewing company statements, press releases and SEC filings prior to and during his investments.

118. On May 17, 2018, Plaintiff Rachael Mooney purchased sixty-nine shares of Boeing common stock at $342.1668 per share based on her reliance upon the integrity of Boeing's current market price and information and research relayed to her by Plaintiff Matthew Mooney. Plaintiff Matthew Mooney reviewed Boeing's 2017 Annual Report, market price and volatility metrics. He relayed his conclusions regarding Boeing to Plaintiff Rachael Mooney stating that Boeing was a honest, market leading aircraft company that had bright prospects for growth based iterative products and an expanding market. Plaintiff Rachael Mooney's investment was based upon Boeing acting lawfully. Had Boeing disclosed in its 2017 Annual Report that it was engaged in a criminal scheme to defraud the United States government or that it was seeking to deceptively secure 'Level B' differences-training based on false pretenses, Plaintiff Rachael Mooney would

42

not have invested in Boeing.  Boeing's omission was even more egregious given it involved the FAA certification of its most important product, the 737 MAX and was perpetrated against its largest customer, the United States government.

119.    From March 11, 2019 through and including March 16, 2020, stating with the sale of two Boeing March 15, 2019 380 put options at $400/contract and terminating with the purchase of seven Boeing January 15, 2021 305 put options at $17,300/contract, Plaintiff Matthew Mooney used Boeing options to create long exposure to Boeing stock. Mooney used these options to construct Boeing stock exposure to take advantage of interest rate advantages that made options exposure more efficient than simply owning the stock (the functional equivalent of owning shares based on its delta adjusted amount). Over the tenure of Plaintiff Matthew Mooney's investment in Boeing he routinely rolled (exiting a near term expiring option and establishing a longer-dated position) his position due to the inherent temporal nature of derivatives and complexities including the non-linear nature of theta decay of options premium.[5]  Plaintiff Matthew Mooney's rolling activity should not be confused with wanton "trading."  Instead, the activity was due to the intrinsic nature of the strategy inputs. Plaintiff Matthew Mooney's investment in Boeing was a single investment based upon his understanding of the risks and potential

---

[5] An equity option's price is derived from five factors (1) the value of the underlying security; (2) the time to expiration; (3) the underlying security's dividend rate; (4) the risk-free interest rate; and (5) the amount of time until the option's expiration.  Option's sensitivities are measured via the "Greeks."  *Delta* is the measure of an option's sensitivity to a move in the underlying security.  *Gamma* is the second derivative.  It measures the sensitivity of delta to a move in the underlying security.  *Vega* is the measure of volatility sensitivity.  *Rho* measures rate sensitivity.  And, theta measures time sensitivity.  *Theta* is non-linear, accelerating into an option's expiration.  For this reason, a seller of shorter-dated options benefits from accelerated 'theta decay.'

rewards. Mooney's understanding was made wrong by Boeing's failure to properly disclose its criminal scheme.

120.    The structure of Plaintiff Matthew Mooney's Boeing investment was equal to him owning Boeing shares and receiving a positive carry rate rather than paying interest. The net effect of his structure was to create a long investment in Boeing. Mooney's investment in Boeing was based upon his review of the current price of Boeing's shares, Boeing's statements and his review of Boeing's 2017, 2018 and 2019 Annual Reports and Boeing's 2018 and 2019 Quarterly Reports. Boeing did not disclose its criminal fraud in any of those reports. Had Boeing disclosed its criminal scheme in its SEC filings, Mooney would not have invested in Boeing's securities.

121.    In fact, Plaintiff Matthew Mooney was especially concerned with the risk associated with his Boeing investment. Since he was employing a derivative structure to invest he was attuned to any factor that may influence Boeing's shares' future volatility as related to is historical (or realized) volatility. Of course, engagement in a criminal scheme would have a material effect on share price volatility. Any factor that could increase tail risk (an extreme outcome associated with a tail on a normal bell curve distribution) would be especially relevant to Plaintiff Matthew Mooney. Criminal activity is a quintessential tail risk. Boeing's criminal conspiracy transformed its risk profile from a normal distribution to a 'fat tail.'  A 'fat tail' is a scenario when there is an elevated probability of an extreme event that may be both (1) position destabilizing and (2) portfolio destabilizing. It is highly foreseeable that a criminal conspiracy could create 'fat tail' risk and upend portfolio risk metrics.

122.    Plaintiff Matthew Mooney was damaged by Boeing due to its deceit regarding the scope of its activity and lawfulness of its 737 MAX.  The damage seeped beyond Plaintiff Matthew Mooney's singular Boeing investment and infected the portfolio in which Boeing was a component.  Boeing lied about its activity which poisoned the market's volatility assumption thereby causing Plaintiff Matthew Mooney' volatility portfolio to be much more volatile and susceptible to exogenous risk (a quintessential 'fat tail').  Plaintiff Matthew Mooney was damaged thereby as Boeing's elevated realized volatility, a product of the materialization of the risks it concealed, filtered through to the overall portfolio causing significant damage.

123.    Mooney terminated his Boeing investment on March 16, 2020, after reviewing the U.S. House Committee on Transportation and Infrastructure report titled, "The Boeing 737 MAX Aircraft: Costs, Consequences, and Lessons from Its Design, Development and Certification, Preliminary Investigative Findings (the "House Report").  The House Report presented, for the first time, its investigation that suggested that Boeing may have acted improperly when obtaining FAA certification for its 737 MAX and MCAS may not have operated as disclosed.  Notably, the House Report did not accuse Boeing of criminal misbehavior. Even after the publication of the House Report it was reasonable for Plaintiffs to believe that Boeing was not engaged in a criminal activity.  Boeing's criminal scheme was not known to Plaintiffs until Boeing's DPA was filed on January 7, 2021.

## THE TRUTH FINALLY COMES TO LIGHT

124.    Boeing's criminal conduct did not come to light until January 7, 2021, with the filing of its DPA.  Until that time, Boeing denied any and all wrongdoing related to its 737 MAX certification process.  On January 10, 2021, the next trading day after January 7, 2021, Boeing's shares closed at $209.31, a far fall from the $342.12 per share that they closed on May 15, 2018 when Plaintiffs started to invest.

125.    In its DPA the DOJ noted that Boeing, "did not receive voluntary disclosure credit pursuant to the Corporate Enforcement Policy in the Department of Justice Manual 9-47. 120, or pursuant to the Sentencing Guidelines, because it did not timely and voluntarily disclose to the Fraud Section the offense conduct described in the Statement of Facts."  Furthermore, Boeing's limited cooperation with the DOJ, "was delayed and only began after the first six months of the Fraud Section's investigation, during which time [Boeing's] response frustrated the Fraud Section's investigation." (Ex. 1, DPA at Page 4-5)

126.    Boeing hid its criminal conduct from the DOJ, investors and Plaintiffs.  In fact, hiding its criminal conspiracy was critical to its success.  Boeing's state of mind in effecting its criminal conspiracy is the same as its state of mind when omitting to disclose the same conspiracy.  The conspiracy and its omission were part of the same scheme.

## BOEING'S CRIMINAL FRAUD WAS THE PROXIMATE CAUSE OF PLAINTIFFS' LOSS; THE MATERIALIZATION OF BOEING'S CONCEALED RISK CAN BE QUANTIFIED BY ITS IMPLIED VOLATILITY METRIC

127.    Plaintiffs' loss was the natural and obvious consequence of the materialization of the risk concealed by Boeing's omission.

46

128.   Boeing's criminal deception caused the FAA to certify the 737 MAX with "Level B" differences-training, thereby making the 737 MAX seem more valuable than it actually was.  Without "Level B" differences-training certification, the 737 MAX would be less competitive and more expensive to operate.  Without "Level B" the 737 MAX and Boeing were less valuable to investors.

129.   By fraudulently obtaining "Level B" differences-training, Boeing ensured that the 737 MAX's MCAS system would be hidden from pilots.  Pilots were literally flying blind.  The risk associated with an MCAS malfunction was elevated by Boeing's fraudulent conspiracy.  That risk materialized in the form of two fatal crashes, a global grounding, billions of dollars of losses and stock price depreciation.

130.   The 737 MAX was Boeing's single most important new product. In 2018, Boeing earned approximately 65.7 of its GAAP earnings from operations from its commercial airplane business.[6]  The success of the 737 MAX was critical to growth and profitability of Boeing's commercial airplane business.

131.   By causing the 737 MAX to be overvalued, Boeing's criminal fraud caused its shares to be overvalued.  As the truth came to light about the 737 MAX and Boeing's fraud, Boeing's shares materially declined.

132.   On or about July 5, 2017, the FAA AEG published the first 737 MAX FSB report, which included the FAA AEG's "Level B" differences-training determination for the 737 MAX.  (Ex. 1—DPA at A-14)

133.   Boeing *admits* that, "[b]ecause of Boeing's intentional withholding of information from the FAA AEG, the final version of the 737 MAX FSB Report lacked

---

[6] Boeing 2018 Annual Report at Page 20.

information about MCAS, and relevant portions of this 737 MAX FSB Report were materially false, inaccurate, and incomplete." (Ex. 1—DPA at A-14)

134.    Boeing *admits* that as a result of the materially false 737 MAX FSB Report, "airplane manuals and pilot-training materials for U.S.-based airlines lacked information about MCAS, and relevant portions of these manuals were similarly materially false, inaccurate, and incomplete as a result." (Ex. 1—DPA at A-14)

135.    Boeing *admits* that, "[a]fter the FAA AEG published the final version of the 737 MAX FSB Report, Boeing continued to sell, and Boeing's U.S.-based airline customers were permitted to fly, the 737 MAX." (Ex. 1—DPA at A-14)

136.    Boeing *admits* that, "[p]ilots flying the 737 MAX for Boeing's airline customers were not provided any information about MCAS in their airplane manuals and pilot-training materials." (Ex. 1—DPA at A-14)

137.    Boeing's admissions make clear that its 737 MAX was introduced to the market based on false pretenses and lies.

138.    On May 17, 2018, Plaintiff Rachael Mooney purchased sixty-nine Boeing shares at $342.1668 each. Plaintiff Rachael Mooney's purchase price incorporated an artificially high 737 MAX valuation based upon Boeing's criminal scheme. On May 15, 2018, Boeing's market-based implied volatility was approximately 25.55.[7] Boeing's

---

[7] Implied volatility is a market-based measure of a security's probable future volatility and range of outcomes. Implied volatility takes into account a security's realized volatility and all known data points which may effect a security's forward path. If a company fraudulently omits to disclose items that may cause its forward path to be more risky, that disclosure will skew its implied volatility thereby giving investors a false sense of security and causing them to over pay for the company's securities.

A good way to think of this is in the insurance context. If an insured lies about his driving record, an insurer may reach a false conclusion about the risk and possible

implied volatility is a good metric to measure how much risk the market associated with an investment in its shares.  Plaintiffs relied on the truth of Boeing's market-based implied volatility which incorporated Boeing's SEC filing statements about its business.

139.    On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly after takeoff into the Java Sea near Indonesia.  All 189 passengers and crew on board died.  (Ex. 1—DPA at A-14)  Boeing's implied volatility increased marginally to 33.081.

140.    Following the Lion Air crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.  The FAA AEG also learned for the first time about MCAS's expanded operational scope.  (Ex. 1—DPA at A-15)

141.    On March 10, 2019, Ethiopian Airlines Flight 302, a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia.  All 157 passengers and crew on board died.  Following the Ethiopian Airlines crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.  (Ex. 1—DPA at A-16)  Boeing's implied volatility was approximately 33.00.

142.    On March 11, 2019, Plaintiff Matthew Mooney began investing in Boeing by selling two Boeing March 15, 2019 expiry 380 strike puts for $400 each.  At that time, Boeing was still hiding its criminal scheme and denying any culpability relating to its 737 MAX problems.  Boeing's shares closed at $400.01 and its three-month implied volatility

---

outcomes involved in providing the driver with auto insurance.  By omitting to disclose the necessary data to properly measure his driving risk, the driver is fraudulent obtaining insurance.  He is transferring risk to the insurance company at a false price.

This is exactly what Boeing did to Plaintiffs.  By failing to disclose its criminal scheme, it caused Plaintiffs to assume that risk at an improper price.  As the natural and expected consequences of Boeing's fraud materialized, its market based implied volatility substantially increased.

measure was 33.346. Plaintiff Matthew Mooney's purchase price incorporated an artificially high 737 MAX valuation and low implied volatility based upon Boeing's failure to disclose its criminal scheme. The market was still overvaluing Boeing's most important product and not discounting its shares to account for its criminal risk. Plaintiff Matthew Mooney expressly relied on Boeing's implied volatility measure (and therefore its risk disclosures) when investing in Boeing on March 11, 2019. Despite two fatal crashes, Boeing's implied volatility was near the level when Plaintiff Rachael Mooney began investing.

143.    Importantly, on March 11, 2019, Boeing's forward implied volatility was below its sixty day realized volatility. The market was concluding that, based in part of Boeing's representations, that it stock's forward path would be less volatile. Had Boeing fully disclosed its criminal scheme, its implied volatility would have eclipsed its realized volatility. Plaintiff Matthew Mooney specifically relied on Boeing's realized versus implied volatility relationship when investing. Boeing's volatility relationship was the direct result of its failure to disclose its criminal scheme.

144.    On March 13, 2019, the 737 MAX was officially grounded in the United States, indefinitely halting further flights of this airplane by any U.S.-based airline. On March 13, 2019, Boeing's implied volatility was approx. 32.325. Boeing's implied volatility was falling and still under its realized volatility of approx. 37.57.

145.    Boeing's criminal scheme to hide MCAS's true characteristics from the FAA was the cause of the FAA's delayed understanding of MCAS. Boeing ***admits*** that the FAA did not learn of MCAS's expanded operational scope until after the Lion Air crash, more than a year after the FAA published its first 737 MAX FSB Report.

146.    Boeing's criminal deception distorted and delayed the FAA's understanding of MCAS and its ability to properly certify the 737 MAX. Boeing's failure to disclose its fraud at all after the Ethiopian Airlines Flight 302 crash or fully cooperate with investigators further delayed 737 MAX recertification and caused the market to continue to misprice the 737 MAX and Boeing's shares.

147.    On March 31, 2019, Boeing misrepresented its 737 MAX culpability in its 2019 Q1 Quarterly Report by omitting to disclose its criminal scheme and stating, "[w]e are also fully cooperating with other U.S. government investigations relating to the accident." (Boeing 2019 Q1 Quarterly Report at Page 14)  Boeing's share price closed on April 1, 2019 at $391.54. On March 31, 2019, Boeing's implied volatility was approx. 28. Its realized volatility was approx. 32.04. Boeing's scheme was working, its implied volatility was falling and investors were underpricing its criminal fraud risk.

148.    On June 30, 2019, Boeing misrepresented its 737 MAX culpability in its 2019 Q2 Quarterly Report by omitting to disclose its criminal scheme and stating, "[w]e are also fully cooperating with other U.S. government investigations related to the accidents." (Boeing 2019 Q2 Quarterly Report at Page 15). On July 1, 2019, Boeing's implied volatility was approx. 26.03, below its realized volatility of approx. 26.60.

149.    In its 2019 Q2 Quarterly Report Boeing acknowledged that the 737 MAX's "grounding has reduced revenues, operating earnings and cash flow during the first half of 2019 and will continue to adversely affect our results until deliveries resume and production rates increase." (Boeing 2019 Q2 Quarterly Report at Page 16)

150.    In Q2 2019, Boeing recorded a charge of $5.61B related to the 737 MAX grounding. Boeing's fraud and its continued effort to hide its scheme was a proximate

51

cause of the 737 MAX's continued grounding and Boeing's massive charge.  Boeing's share price closed on July 1, 2019 at $356.46.

151.    On September 30, 2019, Boeing misrepresented its 737 MAX culpability in its 2019 Q3 Quarterly Report by omitting to disclose its criminal scheme and stating, "[w]e are also fully cooperating with other U.S. government investigations related to the accidents." (Boeing 2019 Q3 Quarterly Report at Page 16).  In its 2019 Q3 Quarterly Report, Boeing acknowledged, "in the event we are unable to resume aircraft deliveries consistent with our assumption, the continued absence of revenue, earnings and cash flows associated with 737 MAX deliveries would continue to have the most material impact on our operating results." (Boeing 2019 Quarterly Report at Page 17).  Boeing's share price closed on October 1, 2019 at $374.94.  On October 1, 2019, Boeing's implied volatility was approx. 30.44, slightly above its realized volatility of approx. 29.32.

152.    On December 31, 2019, in its  2019 Annual Report Boeing misrepresented its risks and culpability related to its 737 MAX.  In its 2019 Annual Report, Boeing did not include criminal liability risk when disclosing its 737 MAX risk.  This was a material omission.  On January 2, 2020, Boeing's shares closed at $333.32.  The 737 MAX remained grounded and further investigation in MCAS was taking its toll on Boeing's shares.  On January 2, 2020, Boeing's implied volatility was approx. 28.90, back below its realized volatility of approx. 29.43.  Boeing's scheme hide its criminal conspiracy was working.

153.    In its 2019 Annual Report, Boeing admitted that the 737 MAX's grounding had, "reduced revenues, operating margins, and cash flows, and [would]

continue to do so until production and deliveries resumed[d] and production rates return[ed] to pre-grounding levels." (2019 Annual Report at Page 5)

154.    On March 6, 2020, the House Report revealed that Boeing may not have properly disclosed MCAS to regulators or its customers.  On March 9, 2020, the next trading day after the issuance of the House Report, Boeing's shares closed at $222.17 and Boeing's implied volatility 64.34. The hidden risk was beginning to be realized in Boeing's shares.

155.    Within days of the House Report, Boeing's implied volatility spiked to 163.207, or 436% higher than its January 2020 level.  At the time, the S&P 500 implied volatility was also spiking but the index's move paled in comparison to Boeing's.  From March 6, 2020 to March 31, 2020, the S&P 500's implied volatility moved from approx. 31.43 to 37.64, a 19.76% move.  Boeing's implied volatility over the same period moved from approx. 53.36 to 92.394, or a 73.15% spike. On March 31, 2020, Boeing's implied volatility was approx. 34.594 points above its realized volatility.  In contrast, on March 31, 2020, the S&P 500's's implied volatility was approx. 20.13 points below its realized volatility. The market was scrambling to adjust its pricing to reflect Boeing's undisclosed material risks while it was calming down overall.  Boeing's implied volatility quantifies its idiosyncratic risk and cannot be fully blamed on market turbulence.

156.    On November 18, 2020 the FAA ungrounded the 737 MAX.  Despite news of the ungrounding, Boeing's shares languished at $203.30.

157.    On January 7, 2021, Boeing's DPA was filed.  It shares closed that day at $238.17.

158. From the period measured by Plaintiff Rachael Mooney's purchase to the filing of Boeing's DPA, Boeing's shares sunk 30.38% and Boeing's implied volatility, the purest quantification of the materialization of concealed risk, more than doubled from the average of Plaintiffs' entry implied volatility level. Boeing's criminal fraud artificially inflated the 737 MAX's value. Its discovery caused the market to penalize and discount Boeing shares. The change in Boeing's implied volatility is a barometer of the materialization.

## BOEING ACTED WITH SCIENTER

159. Boeing acted with scienter when it omitted disclosure of its 737 MAX criminal certification scheme to investors.

160. In its DPA Boeing admits the truth of facts that "establish beyond a reasonable doubt the charge set forth in the Information attached to this Agreement." (DPA at A-1). The charge is criminal conspiracy to defraud the United States, in violation of Title 18, U.S.C., Section 371.

161. Boeing admits to acting with criminal intent to defraud the U.S. government.

162. Boeing admits that "[f]rom at least in and around November 2016 through at least in and around December 2018, in the Northern District of Texas and elsewhere, Boeing, through Boeing Employee-1 and Boeing Employee-2, knowingly, and with the intent to defraud, conspired to defraud the FAA AEG." (DPA at A-5)

163. Boeing also admits that the, "purpose of [its] conspiracy was to defraud the FAA AEG by impairing, obstructing, defeating, and interfering with the lawful function of the FAA AEG by dishonest means in connection with its publication of the

737 MAX FSB Report and its differences-training determination for the Boeing 737 MAX, in order to bring about a financial gain to Boeing and to benefit Boeing Employee-1 and Boeing Employee-2 in connection with the Boeing 737 MAX." (DPA at A-5)

164.    The DOJ stated in Boeing's DPA that Boeing, "did not timely and voluntarily disclose to the Fraud Section the offense conduct described in the Statement of Facts." (DPA at 4)

165.    Deception was a key element of Boeing's scheme to defraud the U.S. government. In order to effectuate its fraud, Boeing could not disclose its scheme. Boeing intentionally omitted disclosure of its criminal conspiracy from its SEC filings in order to effect its scheme to "bring about a financial gain" to itself.

166.    Boeing's omission and failure to disclose its fraud was done with a mental state embracing intent to deceive, manipulate or defraud. Boeing's DPA admission is a concession that it also acted with scienter when omitting to disclose the same conduct in its SEC filings.

### FIRST CLAIM FOR RELIEF

**CLAIM 1—VIOLATION OF SECTION 10(b) OF THE SECURITIES EXCHANGE ACT, §240.10b-5 OF ARTICLE 17 OF THE CODE OF FEDERAL REGULATIONS ("SEC Rule 10b-5")**

167.    Paragraphs 1 through 144 are realleged and incorporated by reference herein.

168.    By engaging in the conduct described above, Boeing violated Section 10(b) of the Securities Exchange Act, §240.10b-5 of Article 17 of the Code of Federal Regulations. Boeing's failure to disclose its criminal conspiracy to defraud the U.S. government during its 737 MAX FAA certification process was a material omission

causing its SEC filings from November 2016 through and including December 31, 2020 to be materially misleading.

169.    Boeing acted with scienter, evidencing a mental state to deceive, manipulate or defraud investors, including Plaintiffs. Boeing admits to engaging in a criminal conspiracy to defraud the U.S. government to unlawfully obtain "Level B" differences-training certification for its 737 MAX. A critical element of Boeing's fraud was secrecy. In order to effect its fraud, Boeing intentionally did not disclose its criminal scheme in in its SEC filings.

170.    Plaintiffs relied on both the integrity of the prevailing market price of Boeing's securities, its market-based implied volatility and Boeing's statements made in its SEC filings when deciding to invest in Boeing. Plaintiff Matthew Mooney reviewed Boeing's SEC filings prior to investing in Boeing and relied on Boeing's statements when deciding to invest. Plaintiff Matthew Mooney communicated Boeing's risk to Plaintiff Rachael Mooney. Had Plaintiffs known that Boeing was engaged in a criminal conspiracy to defraud the U.S. government and obtain 737 MAX FAA certification under false pretenses, they would not have invested in Boeing. This revelation would have caused Boeing's implied volatility to be unknown and therefore its securities to be uninvestable.

171.    As a result of Plaintiffs' reliance Plaintiffs suffered damages in excess of $1.5 million dollars.

172.    Boeing's fraudulent omission was the proximate cause of Plaintiffs' loss. The primary reason for Boeing's share price decline from May 15, 2018 to March 16,

2020 was the materialization of the risks hidden by Boeing's fraud related to its 737

MAX airplane and its criminal conspiracy to defraud the FAA.

### SECOND CLAIM FOR RELIEF

**CLAIM 2—FRAUDULENT OMISSION**

173.     Paragraphs 1 through 144 are realleged and incorporated by reference

herein.

174.     Boeing, by engaging in the conduct described above, effected a fraud upon

Plaintiffs. Both Plaintiffs relied on the truth of Boeing's statements in its SEC filings

when considering an investment in Boeing securities and investing in Boeing's securities.

175.     Boeing's intentional omission to disclose its criminal scheme to defraud

the U.S. government operated as a fraud upon Plaintiffs. In its SEC filings, Boeing chose

to speak about its business risks and its 737 MAX airplane. Foremost among its business

risks was is fraudulent scheme to deceive the FAA. By failing to include disclosure of its

criminal conspiracy, Boeing's disclosures misrepresented its risks to investors, including

Plaintiff. Boeing's incomplete disclosures were false statements made with the specific

intent to deceive investors, including Plaintiffs.

176.     Boeing's criminal conspiracy to obtain improper FAA certification for its

737 MAX airplane was a material non-disclosure. Boeing's fraud resulted in two 737

MAX crashes, the airplane's grounding, an artificially inflated share price, artificially

inflated volatility metrics and billions of dollars of loss for Boeing and its shareholders.

177.     Boeing admits that it engaged in a criminal scheme to defraud the U.S.

government. A necessary part of Boeing's criminal conspiracy was nondisclosure. Its

hiding and omissions related to its misconduct were intentional and done with the admitted purpose of deception.

178.    Plaintiff Matthew Mooney read and reviewed Boeing's SEC filings prior to advising Plaintiff Rachael Mooney to invest and prior to making his own investment in Boeing.  Had Plaintiffs known of Boeing's fraudulent scheme they would not have invested in Boeing securities.  Boeing's criminal conspiracy made its securities' volatility unmeasureable and, therefore, uninvestable.

179.    Boeing's failure to disclose its criminal scheme to trick the FAA into awarding it improper certification for its 737 MAX was the proximate cause of Plaintiff's losses.

180.    As a result of Plaintiffs' reliance Plaintiffs suffered damages in excess of $1.5 million dollars.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court enter a judgment:

A.    For compensatory and punitive damages not less than $1 million for Plaintiff Rachael Mooney and $8 million dollars for Plaintiff Matthew Mooney.

B.    For such other, further and different relief as the Court may deem just and proper.

Dated: January 26, 2022

Respectfully Submitted,

MATTHEW B. MOONEY, ESQ.
VA STATE BAR 48589
10805 CHERRY HILL DRIVE
GLEN ALLEN, VA 23059
P: 203-892-2066
mbm4b11@gmail.com

*Counsel for Plaintiffs.*

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF TEXAS

Fort Worth Division

**FILED**

**January 7, 2021**
KAREN MITCHELL
CLERK, U.S. DISTRICT
COURT bb

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 4:21-CR-005-O |
| | ) | |
| v. | ) | |
| | ) | |
| THE BOEING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFERRED PROSECUTION AGREEMENT

Defendant The Boeing Company (the "Company"), pursuant to authority granted by the

Company's Board of Directors reflected in Attachment B, the United States Department of Justice,

Criminal Division, Fraud Section (the "Fraud Section"), and the United States Attorney's Office

for the Northern District of Texas (the "USAO-NDTX") enter into this deferred prosecution

agreement (the "Agreement"). The terms and conditions of this Agreement are as follows:

### Criminal Information and Acceptance of Responsibility

1.      The Company acknowledges and agrees that the Fraud Section will file the attached

one-count criminal Information in the United States District Court for the Northern District of

Texas charging the Company with Conspiracy to Defraud the United States, in violation of Title

18, United States Code, Section 371 (the "Information"). In so doing, the Company:

(a) knowingly waives any right it may have to indictment on this charge, as well all rights to a

-1-

speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) knowingly waives any objection with respect to venue to any charges by the United States arising out of the conduct described in the Statement of Facts attached hereto as Attachment A (the "Statement of Facts") and consents to the filing of the Information, as provided under the terms of this Agreement, in the United States District Court for the Northern District of Texas. The Fraud Section agrees to defer prosecution of the Company pursuant to the terms and conditions described below.

2.    The Company admits, accepts, and acknowledges that it is responsible under United States law for the acts of its officers, directors, employees, and agents as charged in the Information, and as set forth in the Statement of Facts, and that the allegations described in the Information and the facts described in the Statement of Facts are true and accurate. The Company agrees that, effective as of the date it signs this Agreement, in any prosecution that is deferred by this Agreement, it will not dispute the Statement of Facts set forth in this Agreement, and, in any such prosecution, the Statement of Facts shall be admissible as: (a) substantive evidence offered by the government in its case-in-chief and rebuttal case; (b) impeachment evidence offered by the government on cross-examination; and (c) evidence at any sentencing hearing or other hearing. In addition, in connection therewith, the Company agrees not to assert any claim under the United States Constitution, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, Section 1B1.1(a) of the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines"), or any other federal rule that the Statement of Facts should be suppressed or is otherwise inadmissible as evidence in any form.

-2-

### Term of the Agreement

3.      This Agreement is effective for a period beginning on the date on which the

Information is filed and ending three years from that date (the "Term").  The Company agrees,

however, that, in the event the Fraud Section determines, in its sole discretion, that the Company

has knowingly violated any provision of this Agreement or has failed to completely perform or

fulfill each of its obligations under this Agreement, an extension or extensions of the Term may

be imposed by the Fraud Section, in its sole discretion, for up to a total additional time period of

one year, without prejudice to the right of the Fraud Section to proceed as provided in Paragraphs

26-30 below.  Any extension of the Agreement extends all terms of this Agreement, including the

terms of the reporting requirement in Attachment D, for an equivalent period.  Conversely, in the

event the Fraud Section finds, in its sole discretion, that there exists a change in circumstances

sufficient to eliminate the need for the reporting requirement in Attachment D, and that the other

provisions of this Agreement have been satisfied, the Agreement may be terminated early.  If the

Court refuses to grant exclusion of time under the Speedy Trial Act, Title 18, United States Code,

Section 3161(h)(2), the Term shall be deemed to have not begun, and all the provisions of this

Agreement shall be deemed null and void, except that the statute of limitations for any prosecution

relating to the conduct described in the Statement of Facts shall be tolled from the date on which

this Agreement is signed until the date the Court refuses to grant the exclusion of time plus six

months, and except for the provisions contained within Paragraph 2 of this Agreement.

### Relevant Considerations

4.      The Fraud Section enters into this Agreement based on the individual facts and circumstances presented by this case and by the Company, including:

      a.      The nature and seriousness of the offense conduct, which involved two of the Company's 737 MAX Flight Technical Pilots deceiving the Federal Aviation Administration's Aircraft Evaluation Group ("FAA AEG") about an important aircraft part called the Maneuvering Characteristics Augmentation System ("MCAS") that impacted the flight control system of Boeing's 737 MAX.  Through this deception, the Company interfered with the FAA AEG's lawful function to evaluate MCAS and to include information about MCAS in the 737 MAX FSB Report, and fraudulently obtained from the FAA AEG a differences-training determination for the 737 MAX that was based on incomplete and inaccurate information about MCAS;

      b.      The Company did not receive voluntary disclosure credit pursuant to the Corporate Enforcement Policy in the Department of Justice Manual 9-47.120, or pursuant to the Sentencing Guidelines, because it did not timely and voluntarily disclose to the Fraud Section the offense conduct described in the Statement of Facts;

      c.      The Company received partial credit for its cooperation with the Fraud Section's investigation into the Company's above-described deception of the FAA AEG; the Company's cooperation ultimately included voluntarily and proactively identifying to the Fraud Section potentially significant documents and Company witnesses and voluntarily organizing voluminous evidence that the Company was obligated to produce; such cooperation, however, was delayed and only began after the first six months of the

-4-

Fraud Section's investigation, during which time the Company's response frustrated the Fraud Section's investigation;

      d.     The Company engaged in remedial measures after the offense conduct, including: (i) creating a permanent aerospace safety committee of the Board of Directors to oversee the Company's policies and procedures governing safety and its interactions with the FAA and other government agencies and regulators; (ii) creating a Product and Services Safety organization to strengthen and centralize the safety-related functions that were previously located across the Company; (iii) reorganizing the Company's engineering function to have all Boeing engineers, as well as the Company's Flight Technical Team, report through the Company's chief engineer rather than to the business units; and (iv) making structural changes to the Company's Flight Technical Team to increase the supervision, effectiveness, and professionalism of the Company's Flight Technical Pilots, including moving the Company's Flight Technical Team under the same organizational umbrella as the Company's Flight Test Team, and adopting new policies and procedures and conducting training to clarify expectations and requirements governing communications between the Company's Flight Technical Pilots and regulatory authorities, including specifically the FAA AEG. The Company also made significant changes to its top leadership since the offense occurred;

      e.     The Company ultimately provided to the Fraud Section all relevant facts known to it, including information about the individuals involved in the conduct described in the attached Statement of Facts and conduct disclosed prior to the Agreement;

      f.     The Company's prior history of misconduct includes a criminal conviction from 1989 for an employee illegally obtaining confidential military planning documents,

-5-

and a criminal non-prosecution agreement from 2006 for an employee engaging in procurement fraud. The Company's history also includes a civil FAA settlement agreement from 2015 related to safety and quality issues concerning the Company's Boeing Commercial Airplanes business unit;

    g.    After the offense conduct, the Company undertook the remedial efforts described above and enhanced and has committed to continuing to enhance its compliance program and internal controls, including ensuring that its compliance program satisfies the minimum elements set forth in Attachment C to this Agreement (Corporate Compliance Program);

    h.    The Fraud Section determined that an independent compliance monitor was unnecessary based on the following factors, among others: (i) the misconduct was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management; (ii) although two of the Company's 737 MAX Flight Technical Pilots deceived the FAA AEG about MCAS by way of misleading statements, half-truths, and omissions, others in the Company disclosed MCAS's expanded operational scope to different FAA personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards; (iii) the state of the Company's remedial improvements to its compliance program and internal controls; and (iv) the Company's agreement to meet with and report to the Fraud Section as set forth in Attachment D to this Agreement (Enhanced Reporting Requirements);

    i.    The Company has agreed to continue to cooperate with the Fraud Section as described in Paragraph 5, below;

j.      Accordingly, after considering (a) through (i) above, the Fraud Section believes that the appropriate resolution in this case is a Deferred Prosecution Agreement with the Company; a criminal monetary penalty in the amount of $243,600,000, which reflects a fine at the low end of the otherwise-applicable Sentencing Guidelines fine range; $1,770,000,000 in compensation to the Company's airline customers; $500,000,000 in additional compensation to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302; and the Company's agreement to meet with and report to the Fraud Section as set forth in Attachment D to this Agreement.

## Future Cooperation and Disclosure Requirements

5.      The Company and its subsidiaries and affiliates shall cooperate fully with the Fraud Section in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct under investigation by the Fraud Section, until the later of the date upon which all investigations and prosecutions arising out of such conduct are concluded, or the end of the Term.  At the request of the Fraud Section, the Company and its subsidiaries and affiliates shall also cooperate fully with other domestic or foreign law enforcement and regulatory authorities and agencies in any investigation of the Company, its subsidiaries, affiliates, or any of their present or former officers, directors, employees, and agents in any and all matters relating to the conduct described in this Agreement and the attached Statement of Facts and other conduct. The Company's and its subsidiaries' and affiliates' cooperation pursuant to this Paragraph is subject to applicable law and regulations, as well as valid claims of attorney-client privilege or attorney work product doctrine; however, the Company and its subsidiaries and affiliates must provide to the Fraud Section a log of any information or cooperation that is not provided based on

-7-

an assertion of law, regulation, or privilege, and the Company and its subsidiaries and affiliates bear the burden of establishing the validity of any such assertion. The Company and its subsidiaries and affiliates agree that their cooperation pursuant to this paragraph shall include, but not be limited to, the following:

a.       Upon request of the Fraud Section, the Company and its subsidiaries and affiliates shall truthfully disclose all factual information with respect to their activities and those of their present and former directors, officers, employees, agents, and consultants, including any evidence or allegations and internal or external investigations, about which the Company and its subsidiaries and affiliates have any knowledge or about which the Fraud Section may inquire. This obligation of truthful disclosure includes, but is not limited to, the obligation of the Company and its subsidiaries and affiliates to provide to the Fraud Section, upon request, any document, record or other tangible evidence about which the Fraud Section may inquire of the Company and its subsidiaries and affiliates.

b.       Upon request of the Fraud Section, the Company and its subsidiaries and affiliates shall designate knowledgeable employees, agents, or attorneys to provide to the Fraud Section the information and materials described in Paragraph 5(a) above on behalf of the Company and its subsidiaries and affiliates. It is further understood that the Company and its subsidiaries and affiliates must at all times provide complete, truthful, and accurate information.

c.       The Company and its subsidiaries and affiliates shall use their best efforts to make available for interviews or testimony, as requested by the Fraud Section, present or former officers, directors, employees, agents, and consultants of the Company and its subsidiaries and affiliates. This obligation includes, but is not limited to, sworn testimony

-8-

before a federal grand jury or in federal trials, as well as interviews with domestic or foreign law enforcement and regulatory authorities. Cooperation under this Paragraph shall include identification of witnesses who, to the knowledge of the Company and its subsidiaries and affiliates, may have material information regarding the matters under investigation.

        d.     With respect to any information, testimony, documents, records, or other tangible evidence provided to the Fraud Section pursuant to this Agreement, the Company and its subsidiaries and affiliates consent to any and all disclosures to other governmental authorities, including United States authorities and those of a foreign government of such materials as the Fraud Section, in its sole discretion, shall deem appropriate.

      6.     In addition to the obligations in Paragraph 5, during the Term, should the Company learn of any evidence or allegation of a violation of U.S. fraud laws committed by the Company's employees or agents upon any domestic or foreign government agency (including the FAA), regulator, or any of the Company's airline customers, the Company shall promptly report such evidence or allegation to the Fraud Section.

**Total U.S. Criminal Monetary Amount**

      7.     The Company and the Fraud Section agree that the Total U.S. Criminal Monetary Amount to be paid by the Company pursuant to this Agreement is $2,513,600,000, which comprises the following components as further described below: (i) a criminal monetary penalty of $243,600,000 (the "Criminal Monetary Penalty"); (ii) $1,770,000,000 in compensation to Boeing's airline customers (the "Airline Compensation Amount"); and (iii) $500,000,000 in compensation to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air

Flight 610 and Ethiopian Airlines Flight 302 (the "Crash-Victim Beneficiaries Compensation Amount").

8.      The Company acknowledges that no tax deduction may be sought in connection with the payment of the Criminal Monetary Penalty.  The Company shall not seek or accept directly or indirectly reimbursement or indemnification from any source with regard to the Criminal Monetary Penalty or any other agreement entered into with any other enforcement authority or a regulator concerning the facts set forth in the Statement of Facts.

### Payment of Criminal Monetary Penalty

9.      The Fraud Section and the Company agree that application of the Sentencing Guidelines to determine the applicable fine range yields the following analysis:

a.      The 2018 USSG are applicable to this matter.

b.      <u>Offense Level</u>.  Based upon USSG § 2B1.1, the total offense level is 34, calculated as follows:

| (a)(2) | Base Offense Level | 6 |
| (b)(1)(N) | Gain of More Than $150,000,000 | +26 |
| (b)(10) | Sophisticated Means | +2 |
| **TOTAL** | | 34 |

<u>Base Fine</u>.  Based upon USSG § 8C2.4(a)(2), which imposes a base fine equal to the pecuniary gain to the organization from the offense if such gain is greater than the amount indicated in the Offense Level Fine Table, the base fine is $243,600,000 (representing Boeing's cost-savings, based on Boeing's assessment of the cost associated with the implementation of full-flight simulator training for the 737 MAX).

c.   Culpability Score. Based upon USSG § 8C2.5, the culpability score is 5, calculated as follows:

| | | | |
|---|---|---|---|
| (a) | Base Culpability Score | | 5 |
| (b)(4) | The organization had 50 or more employees and an individual within substantial authority personnel participated in, condoned, or was willfully ignorant of the offense | | +2 |
| (g)(2) | The organization cooperated in the investigation, and clearly demonstrated recognition and affirmative acceptance of responsibility for its criminal conduct | | -2 |
| **TOTAL** | | | 5 |

Calculation of Fine Range:

| | |
|---|---|
| Base Fine | $243,600,000 |
| Multipliers | 1.0 (min) / 2.0 (max) |
| Fine Range | $243,600,000 / $487,200,000 |

10.    The Company agrees to pay the Criminal Monetary Penalty of $243,600,000 to the United States Treasury no later than ten (10) business days after the Agreement is fully executed pursuant to payment instructions provided by the Fraud Section in its sole discretion. The Fraud Section and the Company agree that the Criminal Monetary Penalty is appropriate given the facts and circumstances of this case, including the Relevant Considerations described in Paragraph 4.

11.    The Criminal Monetary Penalty is final and shall not be refunded. Furthermore, nothing in this Agreement shall be deemed an agreement by the Fraud Section that $243,600,000 is the maximum penalty that may be imposed in any future prosecution, and the Fraud Section is not precluded from arguing in any future prosecution that the Court should impose a higher fine, although the Fraud Section agrees that under those circumstances, it will recommend to the Court

-11-

that any amount paid under this Agreement should be offset against any fine the Court imposes as part of a putative future judgment.

### Payment of Airline Compensation Amount

12.     The Company agrees to pay a total Airline Compensation Amount of $1,770,000,000 to its airline customers for the direct pecuniary harm that its airline customers incurred as a result of the grounding of the Company's 737 MAX. The Airline Compensation Amount shall be offset by any payments already made by the Company, as of the date this Agreement is fully executed, to any of its airline customers for the direct pecuniary harm that its airline customers incurred as a result of the grounding of the Company's 737 MAX. The Company shall pay any remaining amounts due under the Airline Compensation Amount to its airline customers by the end of the Term and shall provide documentation to the Fraud Section evidencing the amounts paid.

### Payment of Crash-Victim Beneficiaries Compensation Amount

13.     The Company agrees to pay a total Crash-Victim Beneficiaries Compensation Amount of $500,000,000 to the heirs, relatives, and/or legal beneficiaries of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302. No later than ten (10) business days after the filing of the Information, the Company shall establish an escrow account ("Escrow Account") into which it shall deposit the full Crash-Victim Beneficiaries Compensation Amount. No monies will be paid out of the Escrow Account without prior approval by the Fraud Section.

14.     The parties agree that the appointment of a Crash-Victim Beneficiaries Compensation Claims Administrator (the "Administrator") is appropriate and necessary to determine the proper administration and disbursement of the Crash-Victim Beneficiaries Compensation Amount that the Company will pay to the beneficiaries of the crash victims.

-12-

15. The Administrator, consistent with a process imposed and required by the Fraud Section, will make recommendations to the Fraud Section regarding: (a) the individuals who should receive payments from the Crash-Victim Beneficiaries Compensation Amount; and (b) the compensation amounts that these individuals should receive. Only the Fraud Section shall be empowered to make final decisions regarding: (a) the individuals who should receive the victim payments from the Crash-Victim Beneficiaries Compensation Amount; and (b) the compensation amounts that these individuals should receive.

16. The Company agrees to pay for all costs, fees, and expenses incurred by the Administrator. The Company shall execute an engagement letter with the Administrator that must be approved, in advance of execution, by the Fraud Section.

17. Within twenty (20) business days after the filing of the Information, the Company shall submit a written proposal identifying three (3) candidates to serve as the Administrator, setting forth the candidates' qualifications and credentials. The Fraud Section retains the right, in its sole discretion, to choose the Administrator from among the candidates proposed by the Company. Any submission or selection of the Administrator by either the Company or the Fraud Section shall be made without unlawful discrimination against any person or class of persons. The Fraud Section and the Company will use their best efforts to complete the selection process within thirty (30) calendar days of the execution of this Agreement.

18. The Company agrees that it will not employ or be affiliated with the Administrator for a period of not less than two years from the date on which the Administrator's term expires. Nor will the Company discuss with the Administrator the possibility of further employment or affiliation during the Administrator's term. Upon agreement by the parties, this prohibition will

-13-

not apply to other claims administration responsibilities that the Administrator may undertake in connection with resolutions with foreign or other domestic authorities.

19.     The Company agrees that it will not use the fact that any beneficiary of the crash victims of Lion Air Flight 610 and Ethiopian Airlines Flight 302 seeks or receives any compensation from the Crash-Victim Beneficiaries Compensation Amount to seek to preclude such beneficiary from pursuing any other lawful claim that such beneficiary might have against the Company.

## Conditional Release from Liability

20.     Subject to Paragraphs 26-30, the Fraud Section agrees, except as provided in this Agreement, that it will not bring any criminal or civil case against the Company relating to any of the conduct as described in the attached Statement of Facts or the Information filed pursuant to this Agreement.  The Fraud Section, however, may use any information related to the conduct described in the attached Statement of Facts against the Company:  (a) in a prosecution for perjury or obstruction of justice; (b) in a prosecution for making a false statement; (c) in a prosecution or other proceeding relating to any crime of violence; or (d) in a prosecution or other proceeding relating to a violation of any provision of Title 26 of the United States Code.

      a.     This Agreement does not provide any protection against prosecution for any future conduct by the Company.

      b.     In addition, this Agreement does not provide any protection against prosecution of any individuals, regardless of their affiliation with the Company.

## Corporate Compliance Program

21.     The Company represents that it has implemented and will continue to implement a compliance and ethics program designed, implemented, and enforced to prevent and detect

-14-

violations of the U.S. fraud laws throughout its operations, including those of its subsidiaries, affiliates, agents, and joint ventures, and those of its contractors and subcontractors whose responsibilities relate to the Company's interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers, including, but not limited to, the minimum elements set forth in Attachment C.

22.     In order to address any deficiencies in its internal controls, policies, and procedures, the Company represents that it has undertaken, and will continue to undertake in the future, in a manner consistent with all of its obligations under this Agreement, a review of its existing internal controls, policies, and procedures regarding compliance with U.S. fraud laws, focusing on the Company's interactions with domestic or foreign government agencies (including the FAA), regulators, and any of its airline customers. Where necessary and appropriate, the Company agrees to adopt a new compliance program, or to modify its existing one, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program, including a system of internal controls, designed to effectively detect and deter violations of U.S. fraud laws. The compliance program, including the internal controls system, will include, but not be limited to, the minimum elements set forth in Attachment C.

### Enhanced Corporate Compliance Reporting

23.     The Company agrees that it will report to the Fraud Section periodically, at no less than three-month intervals during the Term, regarding remediation, implementation, and testing of its compliance program and internal controls, policies, and procedures described in Attachment C. During the Term, the Company shall (i) conduct an initial review and submit an initial report, and (ii) conduct and prepare at least two follow-up reviews and reports, as described in Attachment D.

**Deferred Prosecution**

24.    In consideration of the undertakings agreed to by the Company herein, the Fraud Section agrees that any prosecution of the Company for the conduct set forth in the attached Statement of Facts or Information will be and hereby is deferred for the Term.  To the extent there is conduct disclosed by the Company that is not set forth in the attached Statement of Facts or Information, such conduct will not be exempt from further prosecution and is not within the scope of or relevant to this Agreement.

25.    The Fraud Section further agrees that if the Company fully complies with all of its obligations under this Agreement, the Fraud Section will not continue the criminal prosecution against the Company described in Paragraph 1 and, at the conclusion of the Term, this Agreement shall expire.  Six months after the Agreement's expiration, the Fraud Section shall seek dismissal with prejudice of the Information filed against the Company described in Paragraph 1, and agree not to file charges in the future against the Company based on the conduct described in this Agreement, the attached Statement of Facts, or the Information.  If, however, the Fraud Section determines during this six-month period that the Company breached the Agreement during the Term, as described in Paragraphs 26-30, the Fraud Section's ability to extend the Term, as described in Paragraph 3, or to pursue other remedies, including those described in Paragraphs 26-30, remains in full effect.

**Breach of the Agreement**

26.    If, during the Term, (a) the Company commits any felony under U.S. federal law; (b) the Company provides in connection with this Agreement deliberately false, incomplete, or misleading information, including in connection with its disclosure of information about individual culpability; (c) the Company or its subsidiaries and affiliates fail to cooperate as set forth in

-16-

Paragraphs 5 and 6 of this Agreement; (d) the Company fails to implement a compliance program as set forth in Paragraphs 21-22 of this Agreement and Attachment C; or (e) the Company and its subsidiaries and affiliates otherwise fail to completely perform or fulfill each of their obligations under the Agreement, regardless of whether the Fraud Section becomes aware of such a breach after the Term is complete, the Company and its subsidiaries and affiliates shall thereafter be subject to prosecution for any federal criminal violation of which the Fraud Section has knowledge, including, but not limited to, the charges in the Information described in Paragraph 1, which may be pursued by the Fraud Section in the United States District Court for the Northern District of Texas or any other appropriate venue. Determination of whether the Company has breached the Agreement and whether to pursue prosecution of the Company and its subsidiaries and affiliates shall be in the Fraud Section's sole discretion. Any such prosecution may be premised on information provided by the Company, its subsidiaries and affiliates, or their personnel. Any such prosecution relating to the conduct described in the attached Statement of Facts or relating to conduct known to the Fraud Section prior to the date on which this Agreement was signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Company, or its subsidiaries and affiliates, notwithstanding the expiration of the statute of limitations, between the signing of this Agreement and the expiration of the Term plus one year. Thus, by signing this Agreement, the Company agrees that the statute of limitations with respect to any such prosecution that is not time-barred on the date of the signing of this Agreement shall be tolled for the Term plus one year. In addition, the Company agrees that the statute of limitations as to any violation of U.S. federal law that occurs during the Term will be tolled from the date upon which the violation occurs until the earlier of the date upon which the Fraud Section is made aware of the violation or the duration of the Term plus five years, and that

-17-

this period shall be excluded from any calculation of time for purposes of the application of the statute of limitations.

27.     In the event the Fraud Section determines that the Company has breached this Agreement, the Fraud Section agrees to provide the Company with written notice of such breach prior to instituting any prosecution resulting from such breach. Within thirty days of receipt of such notice, the Company shall have the opportunity to respond to the Fraud Section in writing to explain the nature and circumstances of such breach, as well as the actions the Company has taken to address and remediate the situation, which explanation the Fraud Section shall consider in determining whether to pursue prosecution of the Company.

28.     In the event that the Fraud Section determines that the Company has breached this Agreement:  (a) all statements made by or on behalf of the Company or its subsidiaries and affiliates to the Fraud Section or to the Court, including the attached Statement of Facts, and any testimony given by the Company or its subsidiaries and affiliates before a grand jury, a court, or any tribunal, or at any legislative hearings, whether prior or subsequent to this Agreement, and any leads derived from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings brought by the Fraud Section against the Company or its subsidiaries and affiliates; and (b) the Company or its subsidiaries and affiliates shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, Section 1B1.1(a) of the USSG, or any other federal rule that any such statements or testimony made by or on behalf of the Company prior or subsequent to this Agreement, or any leads derived therefrom, should be suppressed or are otherwise inadmissible. The decision whether conduct or statements of any current director, officer, or employee, or any person acting on behalf of, or at the direction of, the Company or its subsidiaries and affiliates will

-18-

be imputed to the Company for the purpose of determining whether the Company has violated any provision of this Agreement shall be in the sole discretion of the Fraud Section.

29.     The Company acknowledges that the Fraud Section has made no representations, assurances, or promises concerning what sentence may be imposed by the Court if the Company breaches this Agreement and this matter proceeds to judgment.   The Company further acknowledges that any such sentence is solely within the discretion of the Court and that nothing in this Agreement binds or restricts the Court in the exercise of such discretion.

30.     On the date that the period of deferred prosecution specified in this Agreement expires, the Company, by the Chief Executive Officer of the Company and the Chief Financial Officer of the Company, will submit the certification set forth in Attachment E and certify to the Fraud Section that the Company has met its disclosure obligations pursuant to Paragraph 6 of this Agreement.  Each certification will be deemed a material statement and representation by the Company to the executive branch of the United States for purposes of Title 18, United States Code, Sections 1001 and 1519, and it will be deemed to have been made in the judicial district in which this Agreement is filed.

<b><u>Sale, Merger, or Other Change in Corporate Form of the Company</u></b>

31.     Except as may otherwise be agreed by the parties in connection with a particular transaction, the Company agrees that in the event that, during the Term, it undertakes any change in corporate form, including if it sells, merges, or transfers business operations that are material to the Company's operations, or to the operations of any subsidiaries or affiliates involved in the conduct described in the attached Statement of Facts, as they exist as of the date of this Agreement, whether such sale is structured as a sale, asset sale, merger, transfer, or other change in corporate form, it shall include in any contract for sale, merger, transfer, or other change in corporate form

a provision binding the purchaser, or any successor in interest thereto, to the obligations described in this Agreement. The purchaser or successor in interest must also agree in writing that the Fraud Section's ability to breach under this Agreement is applicable in full force to that entity. The Company agrees that the failure to include these provisions in the transaction will make any such transaction null and void. The Company shall provide notice to the Fraud Section at least thirty (30) days prior to undertaking any such sale, merger, transfer, or other change in corporate form. The Fraud Section shall notify the Company prior to such transaction (or series of transactions) if it determines that the transaction(s) will have the effect of circumventing or frustrating the enforcement purposes of this Agreement. At any time during the Term the Company engages in a transaction(s) that has the effect of circumventing or frustrating the enforcement purposes of this Agreement, the Fraud Section may deem it a breach of this Agreement pursuant to Paragraphs 26-30 of this Agreement. Nothing herein shall restrict the Company from indemnifying (or otherwise holding harmless) the purchaser or successor in interest for penalties or other costs arising from any conduct that may have occurred prior to the date of the transaction, so long as such indemnification does not have the effect of circumventing or frustrating the enforcement purposes of this Agreement, as determined by the Fraud Section.

## Public Statements by the Company

32.     The Company expressly agrees that it shall not, through present or future attorneys, officers, directors, employees, agents, or any other person authorized to speak for the Company make any public statement, in litigation or otherwise, contradicting the acceptance of responsibility by the Company set forth above or the facts described in the attached Statement of Facts. Any such contradictory statement shall, subject to cure rights of the Company described below, constitute a breach of this Agreement, and the Company thereafter shall be subject to prosecution

as set forth in Paragraphs 26-30 of this Agreement.  The decision whether any public statement by any such person contradicting a fact contained in the attached Statement of Facts will be imputed to the Company for the purpose of determining whether it has breached this Agreement shall be at the sole discretion of the Fraud Section.  If the Fraud Section determines that a public statement by any such person contradicts, in whole or in part, a statement contained in the attached Statement of Facts, the Fraud Section shall so notify the Company, and the Company may avoid a breach of this Agreement by publicly repudiating such statement(s) within five business days after notification.  The Company shall be permitted to raise defenses and to assert affirmative claims in other proceedings relating to the matters set forth in the attached Statement of Facts provided that such defenses and claims do not contradict, in whole or in part, a statement contained in the attached Statement of Facts.  This Paragraph does not apply to any statement made by any present or former officer, director, employee, or agent of the Company in the course of any criminal, regulatory, or civil case initiated against such individual, unless such individual is speaking on behalf of the Company.

33.     The Company agrees that if it, or any of its direct or indirect subsidiaries or affiliates, issues a press release or holds any press conference in connection with this Agreement, the Company shall first consult with the Fraud Section to determine (a) whether the text of the release or proposed statements at the press conference are true and accurate with respect to matters between the Fraud Section and the Company; and (b) whether the Fraud Section has any objection to the release.

34.     The Fraud Section agrees, if requested to do so, to bring to the attention of law enforcement and regulatory authorities the facts and circumstances relating to the nature of the conduct underlying this Agreement, including the nature and quality of the Company's cooperation and remediation.  By agreeing to provide this information to such authorities, the Fraud Section is not agreeing to advocate on behalf of the Company, but rather is agreeing to provide facts to be evaluated independently by such authorities.

## Limitations on Binding Effect of the Agreement

35.     This Agreement is binding on the Company, the Fraud Section, and the USAO-NDTX, but specifically does not bind any other component of the United States Department of Justice, other federal agencies, or any state, local or foreign law enforcement or regulatory agencies, or any other authorities, although the Fraud Section will bring the cooperation of the Company and its compliance with its other obligations under this Agreement to the attention of such agencies and authorities if requested to do so by the Company.

## Notice

36.     Any notice to the Fraud Section under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to the Chief of the Market Integrity and Major Frauds Unit, United States Department of Justice, Criminal Division, Fraud Section, 1400 New York Avenue N.W., Washington, D.C., 20005.  Any notice to the Company under this Agreement shall be given by personal delivery, overnight delivery by a recognized delivery service, or registered or certified mail, addressed to Brett C. Gerry, Chief Legal Officer and Executive Vice President, Global Compliance, The Boeing Company, 100 North Riverside Plaza, Chicago, Illinois 60606.  Notice shall be effective upon actual receipt by the Fraud Section or the Company.

**Complete Agreement**

37.     This Agreement, including its attachments, sets forth all the terms of the agreement

between the Company, the Fraud Section, and the USAO-NDTX.  No amendments, modifications,

or additions to this Agreement shall be valid unless they are in writing and signed by the Fraud

Section, the USAO-NDTX, the attorneys for the Company, and duly authorized representatives of

the Company.

\*      \*      \*

-23-

**AGREED:**

**FOR THE BOEING COMPANY:**

Date: _____1/6/2021_____     By: _____

David L. Calhoun
President and Chief Executive Officer
THE BOEING COMPANY

Date: _____1/6/2021_____     By: _____

Brett C. Gerry
Chief Legal Officer and
Executive Vice President, Global Compliance
THE BOEING COMPANY

Date: _____1/6/2021_____     By: _____

Mark Filip
Craig S. Primis
Patrick Haney
KIRKLAND & ELLIS LLP
*Counsel for The Boeing Company*

Date: _____1/6/2021_____     By: _____

Richard Cullen
Benjamin L. Hatch
Brandon M. Santos
MCGUIREWOODS LLP
*Counsel for The Boeing Company*

-24-

**AGREED:**

**FOR THE UNITED STATES DEPARTMENT OF JUSTICE:**

DANIEL S. KAHN
Acting Chief, Fraud Section
Criminal Division

Date: _1 / 6 / 21_          By: _____

Cory E. Jacobs
Trial Attorney

Date: _1/6/21_          By: _____

Michael T. O'Neill
Assistant Chief

Date: _1/6/21_          By: _____

Scott Armstrong
Trial Attorney

ERIN NEALY COX
United States Attorney
Northern District of Texas

Date: _1/6/21_          By: _____

Chad E. Meacham
Assistant U.S. Attorney

## COMPANY OFFICER'S CERTIFICATE

I have read the Agreement and carefully reviewed its terms and attachments with inside and outside counsel for The Boeing Company (the "Company"). I understand the terms of the Agreement and voluntarily agree, on behalf of the Company, to each of its terms. Before signing the Agreement, I consulted inside and outside counsel for the Company. Counsel fully advised me of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into this Agreement.

With the assistance of the Company's Chief Legal Officer, I have provided the Agreement for review by the Company's Board of Directors, who have been briefed on its principal terms and who have delegated authority to approve the Agreement to a subgroup of the Board of Directors, as set forth and described in the Certificate of Corporate Approval. I have advised and caused outside counsel for the Company to advise the duly authorized subgroup of the Company's Board of Directors fully of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions, and of the consequences of entering into the Agreement.

No promises or inducements have been made other than those contained in the Agreement. Furthermore, no one has threatened or forced me, or to my knowledge any person authorizing the Agreement on behalf of the Company, in any way to enter into the Agreement. I am also satisfied with outside counsels' representation in this matter. I certify that I am the President and Chief Executive Officer for the Company and that I have been duly authorized by the Company to execute the Agreement on behalf of the Company.

Date:  1/6/2021                 By:  _David L. Calhoun_

David L. Calhoun
President and Chief Executive Officer
THE BOEING COMPANY

-26-

## CERTIFICATE OF COUNSEL FOR THE BOEING COMPANY

I am counsel for The Boeing Company (the "Company") in the matter covered by this Agreement.  In connection with such representation, I have examined relevant Company documents and have discussed them with the Company's Corporate Secretary and the subgroup of the Company's Board of Directors to which the Board delegated the authority to approve execution of the Agreement after review of the final documents and terms.  Based on my review of the foregoing materials and discussions, I am of the opinion that the representative of the Company has been duly authorized to enter into the Agreement on behalf of the Company and that the Agreement has been duly and validly authorized, executed, and delivered on behalf of the Company and is a valid and binding obligation of the Company.  Further, I have carefully reviewed the terms of the Agreement with the subgroup of the Board referenced above and the Company's President and Chief Executive Officer.  I have fully advised them of the rights of the Company, of possible defenses, of the Sentencing Guidelines' provisions and of the consequences of entering into the Agreement.  To my knowledge, the decision of the Company to enter into the Agreement, based on the authorization of the Board of Directors, is an informed and voluntary one.

Date: ___1/6/2021___    By: _____

Mark Filip
Craig S. Primis
Patrick Haney
KIRKLAND & ELLIS LLP
*Counsel for The Boeing Company*

Date: ___1/6/2021___    By: _____

Richard Cullen
Benjamin L. Hatch
Brandon M. Santos
MCGUIREWOODS LLP
*Counsel for The Boeing Company*

-27-

**ATTACHMENT A**

**STATEMENT OF FACTS**

1.    The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section"), the United States Attorney's Office for the Northern District of Texas (the "USAO-NDTX") and The Boeing Company ("Boeing" or the "Company"). The Company hereby agrees and stipulates that the following information is true and accurate. The Company admits, accepts, and acknowledges that it is responsible for the acts of its officers, directors, employees, and agents as set forth below. Should the Fraud Section or the USAO-NDTX pursue the prosecution that is deferred by this Agreement, the Company agrees that it will neither contest the admissibility of, nor contradict, this Statement of Facts in any such proceeding. The following facts establish beyond a reasonable doubt the charge set forth in the Information attached to this Agreement:

**Background**

At all times relevant to this Statement of Facts, with all dates being approximate and inclusive:

*Boeing's New Airplane: The 737 MAX*

2.    The Boeing Company ("Boeing") was a U.S.-based multinational corporation that designed, manufactured, and sold commercial airplanes to airlines worldwide. Boeing operated from various locations, including in and around Seattle, Washington.

3.    Boeing's airline customers included major U.S.-based airlines headquartered in the Northern District of Texas and elsewhere.

A-1

4.     The Boeing 737 was a commercial airplane that could seat approximately 200 passengers and was one of Boeing's best-selling airplane models.  Boeing began designing, manufacturing, and selling the Boeing 737 in the 1960s.  Over time, Boeing designed, manufactured, and sold new versions of the Boeing 737 to its airline customers, including major U.S.-based airlines.

5.     In or around June 2011, Boeing began developing and marketing a new version of its Boeing 737 called the 737 MAX.  The 737 MAX was designed by Boeing as a competitive answer to a new version of an airplane developed by one of Boeing's top rivals in commercial airplanes, Company-1.  Like the new version of Company-1's airplane, the 737 MAX promised increased fuel efficiency over its prior version, the 737 Next Generation ("737 NG").  With this increased efficiency, the 737 MAX offered fuel-cost savings for airlines.

*The FAA AEG's Role in Determining Pilot "Differences Training" for New Airplanes*

6.     Before any U.S.-based airline could operate a new commercial airplane, U.S. regulations required the Federal Aviation Administration ("FAA"), an organization within the United States Department of Transportation, to evaluate and approve the airplane for commercial use.  Without this approval, a U.S.-based airline would not be permitted to operate the airplane.

7.     As part of this evaluation and approval process, the FAA had to make two distinct determinations: (i) whether the airplane met U.S. federal airworthiness standards; and (ii) what minimum level of pilot training would be required for a pilot to fly the airplane for a U.S.-based airline.  These two determinations were made by entirely different groups within the FAA that were composed of different personnel with different organizational structures and different reporting lines.

A-2

8.      The FAA Aircraft Evaluation Group ("AEG") was principally responsible for determining the minimum level of pilot training required for a pilot to fly the airplane for a U.S.-based airline.  To make that determination, the FAA AEG compared the new version of the airplane (such as the 737 MAX) to a similar, prior version of the airplane (such as the 737 NG). After evaluating the differences between the new and prior versions of the airplane, the FAA AEG mandated the minimum level of pilot training, known as "differences training," for the new version.

9.      Based on the nature and extent of the differences between the new and prior version of the airplane, the FAA AEG assigned a level of differences training ranging from "Level A" through "Level E."  These levels of differences training ranged in rigor, with "Level A" being the least intensive and "Level E" the most intensive.  As relevant here, "Level B" differences training generally included computer-based training ("CBT") training, and "Level D" differences training generally included full-flight simulator training.

10.     At the conclusion of the FAA's evaluation of the new version of the airplane, the FAA AEG published a Flight Standardization Board Report ("FSB Report").  Among other things, the FSB Report contained relevant information about certain airplane systems and parts that the airplane manufacturer was required to incorporate into airplane manuals and pilot-training materials for all U.S.-based airlines that would fly the airplane.  The FSB Report also contained the FAA AEG's differences-training determination.

**Boeing's 737 MAX Chief Technical Pilots**

11.     Boeing's 737 MAX Flight Technical Team was principally responsible for identifying and providing to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report. The 737 MAX Flight Technical Team was separate and distinct from another group within Boeing that was responsible for providing information to the FAA for certification of whether the airplane met U.S. federal airworthiness standards.

12.     From in or around early 2012 until in or around early 2014, Boeing Employee-1 was a Technical Pilot for Boeing's 737 MAX Flight Technical Team. In or around early 2014, Boeing Employee-1 became Boeing's 737 MAX Chief Technical Pilot. In that role, Boeing Employee-1 led the 737 MAX Flight Technical Team. In or around July 2018, Boeing Employee-1 left Boeing to work for a major U.S.-based airline.

13.     From in or around mid-2014 until in or around July 2018, Boeing Employee-2 was a Technical Pilot for Boeing's 737 MAX Flight Technical Team. In or around July 2018, after Boeing Employee-1 left Boeing, Boeing Employee-2 became Boeing's 737 MAX Chief Technical Pilot. In that role, Boeing Employee-2 led the 737 MAX Flight Technical Team.

14.     Boeing Employee-1 and Boeing Employee-2 understood that the FAA AEG relied on them, as members of Boeing's 737 MAX Flight Technical Team, to identify and provide to the FAA AEG all information that was relevant to the FAA AEG in connection with the FAA AEG's publication of the 737 MAX FSB Report, including information that could impact the FAA AEG's differences-training determination.

A-4

15.     Boeing Employee-1 and Boeing Employee-2 also understood that, because flight controls were vital to flying modern commercial airplanes, differences between the flight controls of the 737 NG and the 737 MAX were especially important to the FAA AEG for purposes of its publication of the 737 MAX FSB Report and the FAA AEG's differences-training determination.

### Overview of the Conspiracy to Defraud the FAA AEG

16.     From at least in and around November 2016 through at least in and around December 2018, in the Northern District of Texas and elsewhere, Boeing, through Boeing Employee-1 and Boeing Employee-2, knowingly, and with intent to defraud, conspired to defraud the FAA AEG.

17.     At all times during the conspiracy, Boeing Employee-1 and Boeing Employee-2 were acting within the scope of their employment and with the intention, at least in part, to benefit Boeing.  The purpose of the conspiracy was to defraud the FAA AEG by impairing, obstructing, defeating, and interfering with the lawful function of the FAA AEG by dishonest means in connection with its publication of the 737 MAX FSB Report and its differences-training determination for the Boeing 737 MAX, in order to bring about a financial gain to Boeing and to benefit Boeing Employee-1 and Boeing Employee-2 in connection with the Boeing 737 MAX.

### Lead-Up to the Conspiracy and Scheme to Defraud

*Boeing's Financial Incentive to Secure No Greater than "Level B" Differences Training in the 737 MAX FSB Report*

18.     As Boeing knew, "Level B" differences training was significantly less expensive for airlines to complete than "Level D."  For example, a pilot could complete "Level B" differences training from anywhere in the world in a matter of hours using a computer or tablet.  In contrast, a

pilot could complete "Level D" differences training only by appearing in person wherever the pilot's airline operated a full-flight simulator. Apart from the cost of acquiring one or more multimillion-dollar simulators and other related expenses, airlines that were required by the FAA AEG to train pilots on a full-flight simulator could also lose revenue that the pilot might otherwise have generated from flying airline passengers during that time. Accordingly, if the FAA AEG required a less rigorous level—such as "Level B"—of differences training for the 737 MAX in the 737 MAX FSB Report, the 737 MAX would be a more attractive option for Boeing's airline customers already flying the 737 NG than switching to an entirely new airplane, such as the new version of Company-1's airplane, as such customers would save significant money in pilot-training costs by transitioning to the 737 MAX.

19.     Principally for this reason, Boeing's stated objectives in designing the 737 MAX included securing the FAA AEG's determination to require no greater than "Level B" differences training in the 737 MAX FSB Report. Boeing Employee-1 and Boeing Employee-2 understood as much. For example, in or around November 2014, Boeing Employee-2 wrote in an internal Boeing electronic chat communication to Boeing Employee-1 that "nothing can jepordize [sic] level b[.]" In or around December 2014, Boeing Employee-1 wrote in an email to another Boeing employee that "if we lose Level B [it] will be thrown squarely on my shoulders. It was [Boeing Employee-1], yes [Boeing Employee-1]! Who cost Boeing tens of millions of dollars!"

A-6

*The Maneuvering Characteristics Augmentation System ("MCAS")*

20.     To achieve its promised fuel efficiency, the 737 MAX used larger engines than the 737 NG. These larger engines, and their placement under the airplane's wings, meant that the aerodynamics of the 737 MAX differed from those of the 737 NG.

21.     These different aerodynamics created a new handling characteristic for the 737 MAX that caused the 737 MAX's nose to pitch up during a certain flight maneuver called a high-speed, wind-up turn. A high-speed, wind-up turn generally involved sharply turning the airplane at high speed (approximately Mach 0.6-0.8) in a corkscrew-like pattern.

22.     A high-speed, wind-up turn was a "certification" maneuver, that is, a maneuver outside the limits of what the 737 MAX would be expected to encounter during a normal commercial passenger flight. Nevertheless, if Boeing did not fix the 737 MAX's pitch-up characteristic in high-speed, wind-up turns, the FAA could determine that the 737 MAX did not meet U.S. federal airworthiness standards.

23.     To fix this pitch-up characteristic, Boeing created MCAS and incorporated it as a part of the 737 MAX's flight controls. MCAS was an aircraft "part" within the meaning of Title 18, United States Code, Sections 31(a)(7) and 38. In operation, MCAS would automatically cause the airplane's nose to pitch down by adjusting the 737 MAX's horizontal stabilizer (a horizontal tail located near the rear of the airplane). As originally designed, MCAS could only activate during a high-speed, wind-up turn.

A-7

*Boeing Employee-1 and Other Boeing Employees Told the FAA AEG that MCAS was Limited to High-Speed, Wind-Up Turns*

24.     In or around June 2015, Boeing Employee-1 and other Boeing employees briefed the FAA AEG on MCAS.  During this briefing, Boeing described MCAS as a system that could only activate during a high-speed, wind-up turn.  After the briefing, Boeing Employee-1 and another Boeing employee further discussed MCAS with an FAA AEG employee ("FAA AEG Employee-1") and reiterated to FAA AEG Employee-1 the limited operational scope of MCAS.

*Boeing Subsequently Expanded MCAS's Operational Scope Beyond High-Speed, Wind-Up Turns*

25.     Subsequently, Boeing expanded MCAS's operational scope, including the speed range within which MCAS could activate, significantly altering its original design.  Among other things, when the airplane registered a high angle of attack, the change expanded the speed range within which MCAS could activate from approximately Mach 0.6-0.8 to approximately Mach 0.2-0.8—that is, from only high-speed flight to nearly the entire speed range for the 737 MAX, including low-speed flight, which generally occurs at a lower altitude and in and around takeoff and landing.  Boeing disclosed this expansion to FAA personnel, but only to those personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards.  Boeing did not disclose the expansion to the FAA AEG personnel responsible for publishing the 737 MAX FSB Report and making the training-related determination.

*Boeing Advocated for the FAA AEG to Publish the 737 MAX FSB Report with No Greater than "Level B" Differences Training*

26.     On or about August 16, 2016, before the FAA AEG published the 737 MAX FSB Report, the FAA AEG issued a provisional "Level B" differences-training determination for the

A-8

737 MAX. At the time of this provisional determination, the FAA AEG was unaware that Boeing had expanded MCAS's operational scope.

27.     On or about the same day, Boeing Employee-1 recognized Boeing's achievement in an email to Boeing employees, including Boeing Employee-2, and wrote that the FAA AEG's provisional determination "culminates more than 3 years of tireless and collaborative efforts across many business units" and that the 737 MAX program management "is VERY happy."

28.     As Boeing Employee-1 and Boeing Employee-2 knew, the FAA AEG based its provisional "Level B" differences training for the 737 MAX in part on its understanding that MCAS could only activate during the limited operational scope of a high-speed, wind up turn.

29.     Boeing Employee-1 and Boeing Employee-2 also understood, as Boeing Employee-1 acknowledged in his email on or about August 16, 2016, that the FAA AEG's "Level B" differences determination for the 737 MAX was only a "provisional approval [. . .] assuming no significant systems changes to the airplane."

30.     For example, in an email to Boeing employees including Boeing Employee-2 discussing a potential change to another part of the 737 MAX's flight controls on or about November 10, 2016, Boeing Employee-1 emphasized that "[o]ne of the Program Directives we were given was to not create any differences [. . .]. This is what we sold to the regulators who have already granted us the Level B differences determination. To go back to them now, and tell them there is in fact a difference [. . .] would be a huge threat to that differences training determination."

A-9

### The Conspiracy Begins

*"Shocker Alert":  Boeing Employee-1 and Boeing Employee-2 Discovered MCAS's Expanded Operational Scope*

31.     On or about November 15, 2016, during a test flight of the 737 MAX in a simulator, Boeing Employee-1 experienced what Boeing Employee-1 recognized as MCAS operating at lower speed.  Boeing Employee-1 further recognized that this lower-speed operation was different from what Boeing had briefed and described to the FAA AEG.

32.     On or about that same day, Boeing Employee-1 and Boeing Employee-2 discussed MCAS in an internal Boeing electronic chat communication, writing in part:

> Boeing Employee-1:  Oh shocker alerT! [sic] / MCAS is now active down to [Mach] .2 / It's running rampant in the sim on me / at least that's what [a Boeing simulator engineer] thinks is happening
>
> Boeing Employee-2:  Oh great, that means we have to update the speed trim description in vol 2
>
> Boeing Employee-1:  so I basically lied to the regulators (unknowingly)
>
> Boeing Employee-2:  it wasn't a lie, no one told us that was the case

33.     At this point, Boeing Employee-1 and Boeing Employee-2 recognized that the FAA AEG was under the misimpression that MCAS operated only during a high-speed, wind up turn and could not operate at lower Mach speeds, such as at Mach 0.2.  Boeing Employee-1 and Boeing Employee-2 therefore knew, at least as of the time of this chat communication, that the FAA AEG's provisional "Level B" differences-training determination had been based in part on outdated and inaccurate information about MCAS.

A-10

34.     Boeing Employee-1 and Boeing Employee-2 also knew that MCAS's expanded operational scope was relevant to the FAA AEG's decisions about the content of the 737 MAX FSB Report, including whether to include information about MCAS.  Boeing Employee-1 and Boeing Employee-2 similarly understood that it was their responsibility to update the FAA AEG about any relevant changes to the 737 MAX's flight controls—such as MCAS's expanded operational scope.

35.     Despite knowing that the FAA AEG had issued its provisional "Level B" determination without any awareness that MCAS's operational scope had been expanded to include high angle of attack conditions in nearly the entire speed range of ordinary commercial flight, Boeing Employee-1 and Boeing Employee-2 did not correct the FAA AEG's understanding of MCAS's operational scope or otherwise ensure that the FAA AEG's "Level B" determination was based on an accurate understanding of MCAS's operation.  Instead, Boeing—through Boeing Employee-1 and Boeing Employee-2—intentionally withheld and concealed from the FAA AEG their knowledge of MCAS's expanded operational scope.

*Boeing, through Boeing Employee-1 and Boeing Employee-2, Deceived the FAA AEG about MCAS's Operational Scope and Told the FAA AEG to Delete MCAS from the 737 MAX FSB Report*

36.     For example, shortly after the simulated test flight described in paragraph 30, Boeing Employee-1 talked with FAA AEG Employee-1, who asked Boeing Employee-1 about the simulated test flight.  Boeing Employee-1 intentionally withheld and concealed from FAA AEG Employee-1 the fact that MCAS's operational scope had been expanded beyond what the FAA AEG relied upon when it issued its provisional "Level B" differences-training determination for the 737 MAX.

A-11

37.     Around the time that Boeing Employee-1 and Boeing Employee-2 discussed MCAS's expanded operational scope, Boeing Employee-1 asked a Boeing senior engineer assigned to the 737 MAX program about MCAS's operational scope.  The senior engineer confirmed to Boeing Employee-1 that MCAS could activate beyond the limited operational scope of a high-speed, wind-up turn.  The senior engineer suggested that Boeing Employee-1 contact certain subject-matter experts at Boeing for more specific information about MCAS's operational scope.

38.     On or about November 17, 2016, the FAA AEG emailed three Boeing employees, including Boeing Employee-1, Boeing Employee-2, and another Boeing employee, a draft of the forthcoming 737 MAX FSB Report.  That same day, Boeing Employee-1 asked Boeing Employee-2 and the other Boeing employee to review the draft 737 MAX FSB Report "for any glaring issues."

39.     On or about November 22, 2016, the other Boeing employee emailed the draft 737 MAX FSB Report back to the FAA AEG with proposed edits.  Boeing Employee-1 and Boeing Employee-2 were included on this email.  Boeing Employee-1 included a proposed edit to delete a reference to MCAS, and wrote, "We agreed not to reference MCAS since it's outside normal operating envelope."  Neither Boeing Employee-1 nor Boeing Employee-2 shared the fact of MCAS's expanded operational scope with the FAA AEG or otherwise corrected the FAA AEG's misimpression that MCAS's operational scope was limited to high-speed, wind-up turns.

40.     In doing so, Boeing Employee-1 and Boeing Employee-2 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "agreed" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during

A-12

the limited operational scope of a high-speed, wind-up turn—remained the same.  Boeing Employee-1 and Boeing Employee-2 withheld their knowledge of MCAS from the FAA AEG to avoid risking the FAA AEG taking any action that could threaten the differences-training determination for the 737 MAX.

41.     On or about January 17, 2017, Boeing Employee-1 again reminded the FAA AEG in an email to delete any reference to MCAS from the forthcoming 737 MAX FSB Report, and wrote, "Flight Controls:  Delete MCAS, recall we decided we weren't going to cover it [. . .] since it's way outside the normal operating envelope."  Again, Boeing Employee-1 deceived the FAA AEG into believing that the basis upon which the FAA AEG had initially "decided" to remove any information about MCAS from the 737 MAX FSB Report—that MCAS could only activate during the limited operational scope of a high-speed, wind-up turn—remained the same.

42.     By concealing MCAS's expanded operational scope from the FAA AEG, Boeing, through Boeing Employee-1 and Boeing Employee-2, defrauded, impaired, obstructed, defeated, and interfered with the FAA AEG's lawful function to evaluate MCAS and to include information about MCAS in the 737 MAX FSB Report.

43.     Based on Boeing's misleading statements, half-truths, and omissions to the FAA AEG about MCAS, and in reliance on those statements and omissions, the FAA AEG agreed to delete all information about MCAS from the 737 MAX FSB Report.

44.     From in or around January 2017 through in or around July 2017 (when the 737 MAX FSB Report was published), Boeing Employee-1 and Boeing Employee-2 sent and caused to be sent emails to representatives of various Boeing airline customers that had agreed to purchase the 737 MAX, including major U.S.-based airlines.  In these emails, Boeing Employee-1 and

A-13

Boeing Employee-2 or members of their 737 MAX Flight Technical Team referenced and included drafts of the forthcoming 737 MAX FSB Report and airplane manuals and pilot-training materials for Boeing's 737 MAX airline customers.  None of these items contained any information about MCAS, consistent with Boeing Employee-1's and Boeing Employee-2's efforts to deceive the FAA AEG into deleting information about MCAS.

### The FAA AEG Published the 737 MAX FSB Report Without Any Information about MCAS and Required No Greater than "Level B" Differences Training

45.    On or about July 5, 2017, the FAA AEG published the first 737 MAX FSB Report, which included the FAA AEG's "Level B" differences-training determination for the 737 MAX.

46.    Because of Boeing's intentional withholding of information from the FAA AEG, the final version of the 737 MAX FSB Report lacked information about MCAS, and relevant portions of this 737 MAX FSB Report were materially false, inaccurate, and incomplete.  In turn, airplane manuals and pilot-training materials for U.S.-based airlines lacked information about MCAS, and relevant portions of these manuals and materials were similarly materially false, inaccurate, and incomplete as a result.

47.    After the FAA AEG published the final version of the 737 MAX FSB Report, Boeing continued to sell, and Boeing's U.S.-based airline customers were permitted to fly, the 737 MAX.  Pilots flying the 737 MAX for Boeing's airline customers were not provided any information about MCAS in their airplane manuals and pilot-training materials.

### Lion Air Flight 610: The First 737 MAX Crash Exposed MCAS's Operational Scope

48.    On October 29, 2018, Lion Air Flight 610, a Boeing 737 MAX, crashed shortly after takeoff into the Java Sea near Indonesia.  All 189 passengers and crew on board died.

A-14

49.     Following the Lion Air crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash. The FAA AEG also learned for the first time about MCAS's expanded operational scope.

50.     In and around the same time, Boeing employees, including Boeing Employee-2, met with personnel from the FAA AEG to discuss, among other things, MCAS's operational scope. After that meeting, Boeing Employee-2 told FAA AEG Employee-1 that he was previously unaware of MCAS's expanded operational scope and otherwise misled FAA AEG Employee-1 about Boeing Employee-2's prior knowledge of MCAS.

51.     Also, in and around the same time, Boeing Employee-2 caused Boeing to present a false and misleading presentation to the FAA AEG about MCAS. Boeing investigated, among other things, what information Boeing Employee-1 and Boeing Employee-2 provided to the FAA AEG about MCAS. In connection with this investigation, Boeing Employee-2 caused Boeing to represent in a presentation to the FAA AEG that, during the training-evaluation process, Boeing and the FAA AEG had "discussed and agreed on [the] removal of MCAS" from the 737 MAX FSB Report and associated materials. This representation was misleading because Boeing Employee-2 had failed to disclose the "shocker alert" chat communication and the fact that the FAA AEG was deprived of relevant information about MCAS.

52.     Following the Lion Air crash, Boeing proposed changes to the operational scope of MCAS, and the FAA AEG worked with Boeing to evaluate these changes to MCAS for purposes of pilot training.

A-15

*Ethiopian Airlines Flight 302:  The Second 737 MAX Crash and the Grounding of the Fleet*

53.     On March 10, 2019, Ethiopian Airlines Flight 302, a Boeing 737 MAX, crashed shortly after takeoff near Ejere, Ethiopia.  All 157 passengers and crew on board died.  Following the Ethiopian Airlines crash, the FAA AEG learned that MCAS activated during the flight and may have played a role in the crash.

54.     On March 13, 2019, the 737 MAX was officially grounded in the United States, indefinitely halting further flights of this airplane by any U.S.-based airline.

*         *         *

A-16

## ATTACHMENT B

## CERTIFICATE OF CORPORATE APPROVAL FOR

## THE BOEING COMPANY

WHEREAS, The Boeing Company (the "Company") has been engaged in discussions with the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") regarding issues arising in relation to the Fraud Section's investigation of violations of U.S. fraud laws by certain of the Company's employees;

WHEREAS, in order to resolve such discussions, it is proposed that the Company enter into a deferred prosecution agreement with the Fraud Section (the "Agreement");

WHEREAS, the Board of Directors of the Company (the "Board") has been extensively briefed on discussions with the Fraud Section regarding an agreement to resolve this matter;

WHEREAS, the Board was informed of the principal terms of the Agreement by the Chief Legal Officer of the Company and agreed that the Company should enter into an agreement on those terms, and delegated to a subgroup of the Board the authority to approve execution of the Agreement after review of the final documents and terms;

WHEREAS, the Board has been provided with the Agreement and its attachments for review; and

WHEREAS, the subgroup of the Board to which this task was delegated has reviewed documents relevant to the Agreement, and has discussed the final terms of the Agreement with David L. Calhoun, the Company's President and Chief Executive Officer, together with inside and outside counsel for the Company; and such counsel have advised Mr. Calhoun and the subgroup of the Company's rights, possible defenses, the Sentencing Guidelines' provisions, and the consequences of entering into the Agreement with the Fraud Section; and such counsel have

B-1

further advised the subgroup that the material terms of the final documents are consistent with the terms of the Agreement previously described to the Board;

Therefore, the subgroup of the Board of Directors to which the Board delegated authority has provided its approval as to the following:

1.     The Company (a) acknowledges the filing of the one-count Information (as such term is described/defined in the Agreement) charging the Company with one count of Conspiracy to Defraud the United States, in violation of Title 18, United States Code, Section 371; (b) waives indictment on such charges and enters into a deferred prosecution agreement with the Fraud Section; and (c) agrees to pay a Total U.S. Criminal Monetary Amount of $2,513,600,000 under the Agreement with respect to the conduct described in the Information;

2.     The Company accepts the terms and conditions of the Agreement, including, but not limited to, (a) a knowing waiver of its rights to a speedy trial pursuant to the Sixth Amendment to the United States Constitution, Title 18, United States Code, Section 3161, and Federal Rule of Criminal Procedure 48(b); and (b) a knowing waiver for purposes of the Agreement and any charges by the United States arising out of the conduct described in the Statement of Facts attached to the Agreement of any objection with respect to venue and consents to the filing of the Information, as provided under the terms of the Agreement, in the United States District Court for the Northern District of Texas; and (c) a knowing waiver of any defenses based on the statute of limitations for any prosecution relating to the conduct described in the Statement of Facts attached to the Agreement and Information or relating to conduct known to the Fraud Section prior to the date on which the Agreement is signed that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement;

B-2

3.      Mr. Calhoun is authorized, empowered and directed, on behalf of the Company, to execute the Agreement substantially in such form as reviewed by the duly authorized subgroup of the Board with such changes as Mr. Calhoun may approve;

4.      Mr. Calhoun is hereby authorized, empowered and directed to take any and all actions as may be necessary or appropriate and to approve the forms, terms or provisions of any agreement or other documents as may be necessary or appropriate, to carry out and effectuate the purpose and intent of the foregoing approval; and

5.      All of the actions of Mr. Calhoun, whose actions would have been authorized by the foregoing approval except that such actions were taken prior to the adoption of such approval, are hereby severally ratified, confirmed, approved, and adopted as actions on behalf of the Company.

Date:    1/5/2021                      By:    _____

                                              Grant M. Dixton
                                              Corporate Secretary
                                              THE BOEING COMPANY

B-3

### ATTACHMENT C

### CORPORATE COMPLIANCE PROGRAM

In order to address any deficiencies in its internal controls, compliance program, policies, and procedures relating to violations of U.S. fraud laws in connection with interactions with any domestic or foreign government agency (including the FAA), regulator, or any of its airline customers, The Boeing Company (the "Company") agrees to continue to conduct, in a manner consistent with all of its obligations under this Agreement, appropriate reviews of its existing internal controls, policies, and procedures.

Where necessary and appropriate, the Company agrees to adopt a new or to modify its existing compliance program, including internal controls, compliance policies, and procedures in order to ensure that it maintains an effective compliance program that is designed, implemented, and enforced to effectively deter and detect violations of U.S. fraud laws. At a minimum, this should include, but not be limited to, the following elements to the extent they are not already part of the Company's existing internal controls, compliance program, policies, and procedures:

*Commitment to Compliance*

1.      The Company will ensure that its directors and senior management provide strong, explicit, and visible support and commitment to its corporate policy against violations of U.S. fraud laws and its compliance codes, and demonstrate rigorous adherence by example. The Company will also ensure that middle management, in turn, reinforces those standards and encourages employees to abide by them. The Company will create and foster a culture of ethics and compliance with the law in its day-to-day operations.

C-1

*Policies and Procedures*

2.     The Company will develop and promulgate clearly articulated and visible corporate policies against violations of U.S. fraud laws, which policies shall be memorialized in a written compliance code.

3.     The Company will develop and promulgate compliance policies and procedures designed to reduce the prospect of violations of U.S. fraud laws and the Company's compliance code, and the Company will take appropriate measures to encourage and support the observance of ethics and compliance policies and procedures against violation of U.S. fraud laws by personnel at all levels of the Company.  These policies and procedures shall apply to all directors, officers, and employees and, where necessary and appropriate, outside parties acting on behalf of the Company, including, but not limited to, agents, consultants, and joint venture partners (collectively, "agents and business partners").  The Company shall notify all employees that compliance with the policies and procedures is the duty of individuals at all levels of the Company.

*Periodic Risk-Based Review*

4.     The Company will develop these compliance policies and procedures on the basis of a periodic risk assessment addressing the individual circumstances of the Company.

5.     The Company shall review its compliance policies and procedures regarding U.S. fraud laws no less than annually and update them as appropriate to ensure their continued effectiveness, taking into account relevant developments in the field and evolving industry standards.

*Proper Oversight and Independence*

6.      The Company will assign responsibility to one or more senior corporate executives of the Company for the implementation and oversight of the Company's compliance code, policies, and procedures regarding U.S. fraud laws.  Such corporate official(s) shall have the authority to report directly to independent monitoring bodies, including internal audit, the Company's Board of Directors, or any appropriate committee of the Board of Directors, and shall have an adequate level of stature and autonomy from management as well as sufficient resources and authority to maintain such autonomy.

*Training and Guidance*

7.      The Company will implement mechanisms designed to ensure that its compliance code, policies, and procedures regarding U.S. fraud laws are effectively communicated to all directors, officers, employees, and, where necessary and appropriate, agents and business partners. These mechanisms shall include:  (a) periodic training for all directors and officers, all employees in positions of leadership or trust, any positions that require such training (*e.g.*, internal audit, sales, legal, compliance, finance), and, where necessary and appropriate, agents and business partners; and (b) corresponding certifications by all such directors, officers, employees, agents and business partners, certifying compliance with the training requirements.  The Company will conduct training in a manner tailored to the audience's size, sophistication, or subject matter expertise and, where appropriate, will discuss prior compliance incidents.

8.     The Company will maintain, or where necessary establish, an effective system for providing guidance and advice to directors, officers, employees, and, where necessary and appropriate, agents and business partners, on complying with the Company's compliance code, policies, and procedures regarding U.S. fraud laws, including when they need advice on an urgent basis.

*Internal Reporting and Investigation*

9.     The Company will maintain, or where necessary establish, an effective system for internal and, where possible, confidential reporting by, and protection of, directors, officers, employees, and, where appropriate, agents and business partners concerning violations of U.S. fraud laws or the Company's compliance code, policies, and procedures regarding U.S. fraud laws.

10.     The Company will maintain, or where necessary establish, an effective and reliable process with sufficient resources for responding to, investigating, and documenting allegations of violations of U.S. fraud laws or the Company's compliance code, policies, and procedures regarding U.S. fraud laws.  The Company will handle the investigations of such complaints in an effective manner, including routing the complaints to proper personnel, conducting timely and thorough investigations, and following up with appropriate discipline where necessary.

*Enforcement and Discipline*

11.     The Company will implement mechanisms designed to effectively enforce its compliance code, policies, and procedures, including appropriately incentivizing compliance and disciplining violations.

12.     The Company will institute appropriate disciplinary procedures to address, among other things, violations of U.S. fraud laws and the Company's compliance code, policies, and procedures regarding the U.S. fraud laws by the Company's directors, officers, and employees.

C-4

Such procedures should be applied consistently and fairly, and in a manner consistent with the violation, regardless of the position held by, or perceived importance of, the director, officer, or employee. The Company shall implement procedures to ensure that where misconduct is discovered, reasonable steps are taken to remedy the harm resulting from such misconduct, and to ensure that appropriate steps are taken to prevent further similar misconduct, including assessing the internal controls, compliance code, policies, and procedures and making modifications necessary to ensure the overall compliance program regarding U.S. fraud laws is effective.

*Mergers and Acquisitions*

13.     The Company will develop and implement policies and procedures for mergers and acquisitions requiring that the Company conduct appropriate risk-based due diligence on potential new business entities, including appropriate due diligence regarding U.S. fraud laws by legal, accounting, and compliance personnel.

14.     The Company will ensure its compliance code, policies, and procedures regarding U.S. fraud laws apply as quickly as is practicable to newly-acquired businesses or entities merged with the Company, and will promptly (a) train the directors, officers, employees, agents, and business partners consistent with Paragraphs 7-8; and (b) where warranted, conduct an audit of all newly acquired or merged businesses as quickly as is practicable concerning compliance with U.S. fraud laws.

*Monitoring, Testing, and Remediation*

15.     In order to ensure that its compliance program does not become stale, the Company will conduct periodic reviews and testing of its compliance code, policies, and procedures regarding U.S. fraud laws designed to evaluate and improve their effectiveness in preventing and detecting violations of U.S. fraud laws and the Company's code, policies, and procedures

C-5

regarding U.S. fraud laws, taking into account relevant developments in the field and evolving industry standards. The Company will ensure that compliance and control personnel have sufficient direct and indirect access to relevant sources of data to allow for timely and effective monitoring and/or testing. Based on such review and testing and its analysis of any prior misconduct, the Company will conduct a thoughtful root cause analysis and timely and appropriately remediate to address the root causes.

**ATTACHMENT D**

**ENHANCED REPORTING REQUIREMENTS**

The Boeing Company (the "Company") agrees that it will report to the United States Department of Justice, Criminal Division, Fraud Section (the "Fraud Section") periodically, at no less than three-month intervals during the Term, regarding remediation, implementation, and testing of its compliance program and internal controls, policies, and procedures described in Attachment C. During the Term, the Company shall (i) conduct an initial review and submit an initial report, and (ii) conduct and prepare at least two follow-up reviews and reports, as described below:

1.    In undertaking the reviews, the Company shall undertake the following activities, among others: (a) inspection of relevant documents, including the Company's current policies, procedures, and training materials concerning compliance with U.S. fraud laws; (b) inspection and testing of selected systems and procedures of the Company at sample sites, including record-keeping and internal audit procedures; (c) meetings with, and interviews of, relevant current and, where appropriate, former directors, officers, employees, business partners, agents, and other persons at mutually convenient times and places; and (d) analyses, studies, and, most importantly, comprehensive testing of the Company's compliance program.

### *Written Work Plans and Reports*

2.    To carry out its enhanced self-reporting obligations, the Company shall conduct an initial review and prepare an initial report, followed by at least two follow-up reviews and reports.

3.    With respect to the initial review and report, after consultation with the Fraud Section, the Company shall prepare the first written work plan within sixty (60) calendar days of

the date this Agreement is executed, and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan.

4.    With respect to each follow-up review and report, after consultation with the Fraud Section, the Company shall prepare a written work plan within forty-five (45) calendar days of the submission of the prior report, and the Fraud Section shall provide comments within thirty (30) calendar days after receipt of the written work plan.

5.    Any disputes between the Company and the Fraud Section with respect to any written work plan shall be decided by the Fraud Section in its sole discretion.

6.    All written work plans shall identify with reasonable specificity the activities the Company plans to undertake in execution of the enhanced self-reporting obligations.

7.    By no later than one year from the date this Agreement is executed, the Company shall submit to the Fraud Section a written report setting forth a complete description of its remediation efforts to date, the results of its testing of its compliance program, and its proposals to ensure that its compliance program is reasonably designed, implemented and enforced so that the program is effective in deterring and detecting violations of U.S. fraud laws.  The report shall be transmitted to:

> Sally B. Molloy
> Cory E. Jacobs
> Michael T. O'Neill
> Scott Armstrong
> United States Department of Justice
> Criminal Division, Fraud Section
> 1400 New York Avenue N.W.
> Washington, D.C. 20005

The Company may extend the time period for issuance of the initial report with prior written approval of the Fraud Section.

8.     The Company shall undertake at least two follow-up reviews and reports, incorporating the views of the Fraud Section on the Company's prior reviews and reports, to further monitor and assess whether the Company's compliance program is reasonably designed, implemented, and enforced so that it is effective at deterring and detecting violations of U.S. fraud laws.

9.     The first follow-up report shall be completed by no later than one year after the initial report is submitted to the Fraud Section.

10.     The second follow-up report shall be completed and delivered to the Fraud Section no later than thirty (30) days before the end of the Term.

### Meetings During the Term

11.     The Company shall meet with the Fraud Section within thirty (30) calendar days after providing each report to the Fraud Section to discuss the report.

12.     At least quarterly, and more frequently if the Fraud Section deems it appropriate in its sole discretion, representatives from the Company and the Fraud Section will meet to discuss the status of the review and enhanced self-reporting obligations, and any suggestions, comments, or improvements the Company may wish to discuss with or propose to the Fraud Section.

### Contemplated Confidentiality of Reports

13.     The reports will likely include proprietary, financial, confidential, and competitive business information. Moreover, public disclosure of the reports could discourage cooperation, impede pending or potential government investigations and thus undermine the objectives of the reporting requirement. For these reasons, among others, the reports and the contents thereof are intended to remain and shall remain non-public, except as otherwise agreed to by the parties in

writing, or except to the extent that the Fraud Section determines in its sole discretion that disclosure would be in furtherance of the Fraud Section's discharge of its duties and responsibilities or is otherwise required by law.

14.     The Company may extend the time period for submission of any of the follow-up reports with prior written approval of the Fraud Section.

### ATTACHMENT E

### CERTIFICATION

To:     United States Department of Justice
        Criminal Division, Fraud Section
        Attention:  Chief of the Fraud Section

Re:     Deferred Prosecution Agreement Disclosure Certification

The undersigned certify, pursuant to Paragraph 30 of the Deferred Prosecution Agreement

("DPA") filed on January _____, 2021 in the United States District Court for the Northern District

of Texas, by and between the United States of America and The Boeing Company (the

"Company"), that undersigned are aware of the Company's disclosure obligations under Paragraph

6 of the DPA, and that the Company has disclosed to the United States Department of Justice,

Criminal Division, Fraud Section (the "Fraud Section") any and all evidence or allegations of

conduct required pursuant to Paragraph 6 of the DPA, which includes evidence or allegations of

any violation of U.S. fraud laws committed by the Company's employees and agents upon any

domestic or foreign government agency (including the FAA), regulator, or any of the Company's

airline customers ("Disclosable Information").  This obligation to disclose information extends to

any and all Disclosable Information that has been identified through the Company's compliance

and controls program, whistleblower channel, internal audit reports, due diligence procedures,

investigation process, or other processes.  The undersigned further acknowledge and agree that the

reporting requirements contained in Paragraph 6 and the representations contained in this

certification constitute a significant and important component of the DPA and of the Fraud

Section's determination whether the Company has satisfied its obligations under the DPA.

E-1

The undersigned hereby certify that they are the Chief Executive Officer and the Chief Financial Officer of the Company, respectively, and that each has been duly authorized by the Company to sign this Certification on behalf of the Company.

This Certification shall constitute a material statement and representation by the undersigned and by, on behalf of, and for the benefit of, the Company to the executive branch of the United States for purposes of 18 U.S.C. § 1001, and such material statement and representation shall be deemed to have been made in the Northern District of Texas. This Certification shall also constitute a record, document, or tangible object in connection with a matter within the jurisdiction of a department and agency of the United States for purposes of 18 U.S.C. § 1519, and such record, document, or tangible object shall be deemed to have been made in the Northern District of Texas.

Date: _____        Name (Printed): _____

                               Name (Signed): _____
                               Chief Executive Officer
                               THE BOEING COMPANY

Date: _____        Name (Printed): _____

                               Name (Signed): _____
                               Chief Financial Officer
                               THE BOEING COMPANY

E-2